THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SYLVESTER ABRAMS, Defendant-Appellant.

First District (2nd Division)   No. 1—92—2804

Opinion filed March 29, 1994.—Rehearing denied April 28, 1994.

568

Frederick F. Cohn, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Lawrence Page, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

On January 3, 1990, Jennifer Williams was standing in the entryway of her aunt's apartment building, watching as her brother, Leroy Williams, loaded his car with boxes when she noticed a group of approximately seven males huddled together at the nearby corner of Grenshaw Street and Central Park Avenue in the City of Chicago. She recognized one of the individuals on the corner to be defendant, whom she knew by his nickname, "Dusty."

As her brother was placing the boxes in the car, defendant, who was wearing a "Christmas green" jogging suit, fired two shots in Leroy's direction from a position which was around 50 or 60 feet away from Jennifer. After he fired the shots from the corner, defendant ran around the building toward the alley, from which point he fired three more rounds at Leroy. While attempting to flee from the fusillade, Leroy was struck by these later rounds; he fell to the pavement in front of the vehicle, whereupon defendant ran through the alley, heading toward Roosevelt Road. When defendant fired the shots, the sun was shining and nothing obstructed Jennifer's view of him or her brother.

Jennifer went to her brother's aid and called to her cousin, Nakita Bailey, instructing her to telephone for an ambulance. The police arrived on the scene soon after the shooting and learned from Jennifer that "Dusty shot her brother." She provided no description of the assailant nor did the police seek one, and throughout her cross-examination, she repeatedly denied having described the physical characteristics of the shooter to any officer to whom she had spoken. After being interviewed, Jennifer rode to the hospital with her brother, where he was pronounced dead.

Later that night, after she was told that she was being taken to the station to view a lineup in order to identify her brother's suspected murderer, the police led her into a room which had a window that exposed another room where defendant sat, by himself, behind a table. She identified the individual in the room as the person who had killed her brother. She denied defendant's assertion on cross-examination that the police had warned her ahead of time that defendant would be in the room.

Jennifer had been acquainted with defendant fairly well for approximately five years prior to the incident, having played cards with him. She described him in her testimony as being dark-skinned and estimated that he weighed 260 pounds. She stated that she would see him around her neighborhood nearly every day in those five years, and that prior to the shooting she felt no animosity toward him; in fact, she spoke cordially to him the day before he shot her brother.

Jennifer was also acquainted with three of defendant's brothers, including his brother Jimmy, whom she described as tall, although shorter than defendant, with a light brown complexion, and as having curls in his hair. She guessed that Jimmy weighed around 160 pounds at the time of the shooting. Jennifer further testified that she went to school with Jimmy and that, prior to the shooting, she had last spoken to him before the Christmas holiday. She did not recall seeing Jimmy hang around Grenshaw Street, but believed him to be seen regularly on Roosevelt Road.

Nakita Bailey testified that on the day of the shooting she was in her third-floor apartment, looking out its front window, from which position she had an unobstructed view of the street below her, where she saw Leroy filling a car with packing crates. She observed "Dusty" fire two bullets at the car. When she first saw him, he was wearing a green jogging suit, standing at the corner of Grenshaw and Central Park. After defendant fired the first two rounds, Nakita lost sight of him for about a minute, only to see him again across the street as he fired three more shots at the victim. She had been aware of defen-

dant, whom she knew as "Dusty," and who she later learned was named Sylvester Abrams, for nearly three years before the shooting because he was a companion of her cousin, the victim's twin brother. She had also seen him many times around her neighborhood.

After being reminded on cross-examination that she had related in her direct testimony that she first spoke of the incident during the year of the trial, nearly two years after the fact, Nakita explained that she first told Jennifer of what she witnessed when Jennifer lamented the fact that no one had come forward to testify against defendant. On redirect, when asked why she did not reveal her knowledge of the shooting much earlier, she replied "[b]ecause I was afraid the gang members would do the same to me." Defendant's objection to this answer was overruled.

Chicago police officer Consuelo Morgan and her partner were the first officers to arrive at the scene of the shooting. She began her initial investigation of the incident by questioning those who had gathered around the body and from these interviews, she learned the name of the perpetrator and obtained what she termed a general description of him. In her report, Morgan wrote that the perpetrator was "5'6" and weighed 185 pounds." In that same report, she listed the names of some of the witnesses with whom she spoke but omitted others "because they were afraid to speak." The court sustained defendant's prompt objection to this response and his motion that it be stricken, but it denied his motion that it declare a mistrial. Officer Morgan testified that Jennifer did not give a description of the shooter because she was distraught, but that she did identify him by name.

Detective John McKenna and his partner Detective Dave Delponte, who were assigned to investigate the murder of Leroy Williams, testified that they went to the scene and found that the victim's automobile had been punctured by bullet holes, and that in the report they filed at the end of their shift, they described the assailant as being 5 feet 6 inches tall and weighing about 160 pounds.

The investigator assigned to the case in the shift subsequent to that of McKenna and Delponte, Detective Mike Miller, upon learning that the perpetrator suspected of the shooting lived at 700 South California, went there with other officers, knocked on his door, which defendant opened but, upon discovering who was knocking, tried to close it. The officer prevented the door from being closed, announced his authority, and informed defendant he was under arrest; defendant, however, turned and raced for the back of the unit. Detective Miller pursued and caught him, placed him in handcuffs, informed him of his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S.

436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and transported him to the station house, where Jennifer positively identified him as her brother's murderer. On cross-examination, Miller responded affirmatively when defendant asked whether he had informed Jennifer beforehand that she would be seeing defendant. The detective explained that he did not employ a lineup in this case because there was no question but that the witness knew the identity of the perpetrator; the purpose of the identification would be to exclude defendant if possible, and a lineup, therefore, would be a waste of police resources.

After Miller completed his testimony, the court recessed for lunch. When it reconvened in the afternoon, counsel for defendant objected to the conditions in the holding cell area provided for attorney/client consultations and complained that in order to converse the two were forced to shout, thus allowing the other detainees to eavesdrop on their conversation. He requested an opportunity to confer with his client before the trial recommenced, to which the court suggested that the two whisper at their table in the courtroom. When counsel informed the judge that he thought that inadequate because the arrangement afforded them no privacy, she told him that given security considerations, that was the only available option.

The State then called Officer Bruce Brady, who related that on January 4, 1990, while on patrol he observed a man walking northbound on Central Park Avenue, being followed by a group of men wielding baseball bats. The pursuers shouted that the man they chased carried a gun. The officer arrested the man and, while conducting a custodial search, recovered a .38-caliber revolver, which was loaded. He subsequently learned that the arrestee was Jimmy Abrams, defendant's brother. The detective estimated in the arrest report that Jimmy was 5 feet 5 inches tall and weighed 145 pounds. The parties stipulated that ballistic tests showed that the .38 which the officer confiscated from Jimmy was the weapon used to kill Leroy Williams.

Defendant testified on his own behalf, stating that he did not shoot Leroy Williams and that he never played cards with Jennifer. He described his brother Jimmy as being about 5 feet 6 inches tall and weighing about 160 pounds with a complexion slightly lighter than his own. He recalled that on the afternoon of the shooting, he was playing basketball with men whom he knew only by appearance.

Defendant also called Chicago police detective Greg Braunberg, one of the six or eight officers who had been present at his arrest, in order to clarify in which room of the apartment he was arrested.

Braunberg testified that defendant was subdued, after a chase, at the threshold of the door which separated the bedroom from the living room. The jury found defendant guilty of first-degree murder, after which the court sentenced him to 30 years in prison.

## I

The first issue presented for review concerns whether defendant was denied the benefit of counsel over the lunch recess which interrupted the trial when the State had only one more witness to call before it was to rest, after which defendant was to present his evidence. In *Geders v. United States* (1976), 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330, the United States Supreme Court held that where, prior to an overnight recess, a trial court instructs a defendant and/or his counsel not to discuss anything about the case during the overnight break, the court had unconstitutionally deprived that defendant of the vital " 'guiding hand of counsel' " (*Geders*, 425 U.S. at 89, 47 L. Ed. 2d at 599, 96 S. Ct. at 1335, quoting *Powell v. Alabama* (1932), 287 U.S. 45, 68-69, 77 L. Ed. 158, 170, 53 S. Ct. 55, 64), which mandated a reversal of the defendant's conviction. In *Geders*, the recess came in the middle of the defendant's testimony after he had completed his direct testimony, but before the government had commenced its cross-examination of him. The Court concluded that this was a critical time in the proceeding because it would be during the night that counsel and his client would confer to map strategy, obtain potentially valuable information from the defendant not disclosed during his testimony or merely to "discuss with counsel the significance of the day's events." *Geders*, 425 U.S. at 88, 47 L. Ed. 2d at 599, 96 S. Ct. at 1335.

The rule of *Geders* has been expanded to strike orders which prohibit attorney/client consultations over the lunch recess (*United States v. Conway* (5th Cir. 1980), 632 F.2d 641), or even during a 21-minute break in the conduct of a trial. (*United States v. Allen* (4th Cir. 1976), 542 F.2d 630.) In *Mudd v. United States* (D.C. Cir. 1986), 798 F.2d 1509, 1511, Judge Mikva, writing for the majority, opined that the lesson of the progeny of *Geders* was that "a trial court may not place a blanket prohibition on all attorney/client contact, no matter how brief the trial recess." This view of *Geders* was slightly modified by the Supreme Court in *Perry v. Leeke* (1989), 488 U.S. 272, 102 L. Ed. 2d 624, 109 S. Ct. 594, where the court held that the sixth and fourteenth amendment guarantees of the right to counsel are not offended where the trial court proscribes consultations between the defendant and his attorney during a 15-minute recess which comes in the midst of the defendant's direct testimony. *Leeke*

emphasized that its rule applied only when the trial court was compelled to interrupt the direct testimony of the defendant; therefore, in a context other than that present in *Leeke*, the conclusion of *Mudd* regarding the unconstitutionality of broad prohibitions on attorney/client conferences during recesses is not invalidated by that decision.

Defendant maintains that his ability to consult with his attorney was impermissibly impaired in this case. He explains that during the lunch recess on the day the State was to rest and he was to begin presenting his evidence, he was not able to speak with his attorney. He does not allege that the court expressly prohibited their consultations, but rather he argues that the bar occurred because the court did not provide him a private room wherein the two could talk confidentially. After the court was again in session, defense counsel informed it that the facilities where defendant, who was detained before and during his trial, was being held did not afford the two any measure of privacy. According to counsel, he could converse with his client in the holding cell only by shouting through a "tiny little hole" in a glass partition. Counsel told the court that because the two were forced to communicate in such loud voices, their conversation could be heard by the other individuals also being detained in the common holding cell area. Counsel therefore declined to hold a conference over the lunch recess, electing instead to seek an opportunity to meet with his client confidentially after the court reconvened.

The trial court, upon learning of the poor acoustics in the holding cell area, suggested that defendant and counsel confer privately at the counsel table within the well of the courtroom. Defendant refused this offer, maintaining that it afforded them insufficient privacy given the close proximity of the prosecuting attorneys, the deputy sheriff and the trial judge. He requested a conference room, which the judge explained could not be provided for the reason that the courthouse accommodations did not include that type of facility for defendants and their attorneys because of security concerns. Counsel also asked the court to be allowed to speak confidentially with his client through cell bars, as had been the common past practice in the Criminal Courts building, which the court also had to deny, citing a change in security procedures.

■ Defendant argues that his inability to consult with counsel violates *Geders* and that consequently he must be retried. We disagree, however, because we find that the rule of *Geders* simply does not obtain in this case. That decision did not hold that a conviction must be reversed whenever conditions existed during trial which rendered client/attorney consultations less than ideal. Instead, the decision found reversible error only because the court, by ordering

the defendant sequestered during the recess, actively prevented him from seeing his attorney. Here, the court imposed no prohibition comparable to the sequestration orders found in *Geders* and *Mudd* to have violated the due process clause. Rather, the reason defendant and his attorney did not consult over the lunch recess was because counsel found the area set aside for the types of consultations contemplated by *Geders* not to be amenable to its intended purpose. Thus, there was no order by the court which deprived defendant of his freedom to speak with counsel; therefore, under *Geders*, the court did nothing which would necessitate reversal of defendant's conviction.

Moreover, even if we were to conclude that conditions such as the acoustics of the room where defendant and his attorney were to speak can serve to deny their ability to do so effectively and thereby violate *Geders*, defendant's conviction would still not warrant reversal. In *People v. Brooks* (1987), 115 Ill. 2d 510, 505 N.E.2d 336, our supreme court held that a defendant who alleges a violation of *Geders* has the obligation to prove that he was actually, as opposed to theoretically, denied his right of consultation. In the record before this court there is nothing but the conclusory argument of counsel to support defendant's contention that the area set aside for their deliberations was inadequate or made such a meeting impracticable or worthless. Since the record presented for our review contains no such evidence, defendant has not established that his ability to consult with counsel was actually impaired, a factor our supreme court found to be an "essential predicate for relief" in cases such as this. *Brooks*, 115 Ill. 2d at 520, 505 N.E.2d at 340.

## II

Defendant next claims that a variety of evidentiary errors made by the trial court merit reversal of his conviction and a remand of the action for a new trial. We note at the outset that in many instances of alleged error, defendant simply asserts error and concludes that he was prejudiced thereby without bothering to offer pertinent case law or authority, other than cases which stand for the broadest principles of law with only an oblique relation to the issue being discussed; nor does he analyze how the purported error affected his case. Therefore, he should be aware that under Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)), he certainly could be deemed to have waived these issues on appeal.

Defendant first urges reversal of the court's denial of his motion for a mistrial, which he asserted after the State elicited from one of the investigating officers who testified that, in her report of the case,

she listed the names of some of the witnesses to whom she spoke during her investigation, but did not name others who professed a fear of speaking. Defendant maintained that this hearsay bolstered the State's evidence linking him to the crime and turned the jury against him because it would cause them to empathize with those who feared him.

The propriety of declaring a mistrial is within the discretion of the circuit court. (*People v. Redd* (1990), 135 Ill. 2d 252, 323, 553 N.E.2d 316, 348, citing *People v. Hall* (1986), 114 Ill. 2d 376, 405, 499 N.E.2d 1335, 1346; see also *People v. Winfield* (1983), 113 Ill. App. 3d 818, 447 N.E.2d 1029.) Our supreme court has instructed us that "[a] mistrial should generally be declared only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial." (*Redd*, 135 Ill. 2d at 323, 553 N.E.2d at 348; see also *People v. Clark* (1992), 231 Ill. App. 3d 571, 574-75, 596 N.E.2d 642, 644 ("A mistrial is necessary when it appears that the jury was so influenced and prejudiced that it could not have been fair and impartial and that the damaging effect could not be cured by admonitions and instructions"); *People v. Dotson* (1986), 143 Ill. App. 3d 135, 146, 492 N.E.2d 903, 910 ("The power to grant a mistrial in a criminal prosecution should be used with the greatest caution, under urgent circumstances and for very plain and obvious causes ***").) To warrant the reversal of a court's denial of a motion for a mistrial, the appellant must show that he suffered prejudice from both the introduction of the incompetent evidence which precipitated the motion and the court's subsequent denial thereof (*People v. Williams* (1985), 137 Ill. App. 3d 736, 744, 484 N.E.2d 1191, 1197); he also must show that the resulting damage could not have been effectively remedied by admonitions and instructions. *People v. Alvarez* (1989), 186 Ill. App. 3d 541, 549, 542 N.E.2d 737, 742.

Defendant, citing *People v. Cepek* (1934), 357 Ill. 560, 192 N.E. 573, argues that the error here was of such a magnitude that a mistrial should have been declared to preserve the integrity of the proceeding. However, no issue was raised in *Cepek* regarding a mistrial. Instead the case concerned the impropriety of the prosecuting attorney's having aired to the jury, while in summation, his personal opinion as to whether the defendant was guilty or innocent, an occurrence which did not happen in the instant case.

■ In any event, in the case *sub judice*, the inadmissible hearsay did not prejudice defendant to the point that a mistrial was called for. The court sustained defendant's objection to the evidence and struck it from the record. At no point did defendant request a curative instruction, so we may gather that he did not deem the

inadmissible evidence especially harmful at the time it was offered; moreover, he offers nothing but a conclusory assertion of prejudice to convince that he, in fact, suffered any detriment from it. Thus, he has not established that the court erred in denying his mistrial.

He next argues that the State impermissibly tarred him as a gang member when it elicited from Nakita Bailey that she waited two years to inform the police that she had witnessed the murder because she was "afraid the gang members would do the same to [her]." Defendant also contends that the State, in summation, compounded this error by arguing that "the fact that Nakita Bailey did not tell anyone about this until January of [1992], should not be bothersome, because Nakita Bailey specifically said when asked why, [']*** because I was afraid the gang members would do the same to me.[']"

The courts of this State have recognized that evidence which tends to suggest that a criminal defendant has gang affiliations poses unique problems when offered in a case tried before a jury because "there is a deep, bitter and widespread prejudice against street gangs in every large metropolitan area in America." (*People v. Parrott* (1976), 40 Ill. App. 3d 328, 331, 352 N.E.2d 299, 302; see also *People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900.) The fact that gang membership conjures up a negative image in the mind of jurors does not, however, preclude the admission of all such evidence on a *per se* basis. (*Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.) Instead, evidence of gang affiliation is admissible if relevant to an issue other than merely to cast the accused in a scurrilous light. The State responds that in the case at bar the gang reference was offered not to defame defendant, but to counter the persistent theme of defendant's cross-examination of Nakita that the jury should discount her testimony as having been invented in light of her having waited two years to tell anyone what she had seen.

As the State suggests, this evidence was relevant to an issue other than just the defendant's gang membership; it was the State's only means of removing the taint of recent fabrication by Nakita which defendant's cross-examination raised. In addition, the State, even in its closing argument, never tried to exploit the gang membership except to argue that the jury should consider it only for the reason for which it was offered: to buttress the credibility of Nakita. (See *People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864 (holding that it was not misconduct for the State's Attorney to remind the jury in summation that the defendant was a gang member if based on properly admitted evidence of membership and used in the closing for the reason for which it was admitted).) Thus under *Smith*,

neither the admission of gang membership into evidence nor the State's comment thereon in summation denied defendant a fair trial, and the court's overruling defendant's objection to the evidence was not in error.

■ Defendant further complains that he is entitled to a new trial because the State's Attorney's summation argued facts not in evidence and mischaracterized defendant's theory of the case. The only statements of the prosecutor which he discusses with any measure of specificity concern the prosecutor's chiding of defendant's theory of the case. Defendant argues that the prosecutor tried to persuade the jury that defendant would have them believe that all of the State's witnesses conspired to convict him. In *People v. Andras* (1992), 241 Ill. App. 3d 28, 608 N.E.2d 310, this court recently addressed a complaint similar to the one raised here. In *Andras* the main theme of the State's argument was that under the defendant's view of the case, the witnesses against him were all liars conspiring to convict him. The court found the State's arguments, although a sardonic exaggeration of the defendant's case, not to rise to such a level of misconduct as to warrant reversal because the State never insinuated that to find the defendant innocent, the jury would have to disbelieve all of the State's witnesses.

Here, the State made only one such reference, as opposed to the repeated references in *Andras*, and in no way did it even attempt to leave the impression that defendant must be deemed guilty unless the jury found *all* the State's witnesses unworthy of belief. Thus, we conclude that defendant was not prejudiced by any alleged misconduct of the State while presenting its closing argument.

■ Defendant also argues that the court should consider the cumulative impact on his case inflicted by these alleged errors. However, given that defendant fails to establish that the circuit court actually made any errors, we see no reason to contemplate any possible cumulative effect. *People v. Albanese* (1984), 102 Ill. 2d 54, 82-83, 464 N.E.2d 206, 220 (declining the defendant's invitation to consider the cumulative effect of alleged errors and holding that "[t]he whole can be no greater than the sum of its parts, and defendant has failed to demonstrate anything approaching reversible error in the myriad of arguments offered to justify a new trial").

### III

Defendant's third assignment of error concerns the court's sustaining the State's objection to a question posed to Consuelo Morgan, one of the officers who initially investigated this case, during her cross-examination. Defendant, citing only the sixth amendment

to the Federal Constitution, contends that he was deprived of the right of confrontation secured by that amendment when the court refused to permit that question to be answered.

■ While the cross-examination of a witness which is designed to explain, modify or discredit anything to which the witness has testified on direct examination is a matter of right (*People v. Barr* (1972), 51 Ill. 2d 50, 51, 280 N.E.2d 708, 710; *People v. Torres* (1990), 200 Ill. App. 3d 253, 265, 558 N.E.2d 645, 654), the trial court retains the authority to limit its scope, and its decision to do so will not be disturbed unless it constitutes an abuse of discretion resulting in manifest prejudice to defendant. (*People v. Sandoval* (1990), 135 Ill. 2d 159, 194, 552 N.E.2d 726, 741-42; *People v. Coleman* (1991), 222 Ill. App. 3d 614, 626, 584 N.E.2d 330, 338.) Here, the court properly exercised its discretion by sustaining the State's objection to a repetitive question asking whether Officer Morgan had included in her report that the State's occurrence witness, Jennifer, informed her that she saw the offender. Immediately prior to posing the question at issue on appeal, defendant asked the officer if she had stated in her report that Jennifer had told her that she saw the offender. When he next asked the same question in a slightly different way, the court sustained the State's objection on the ground that the posed question had been already answered. Since it had been, the court was correct to prohibit defendant's repetitious inquiry. See *People v. Triplett* (1985), 108 Ill. 2d 463, 475, 485 N.E.2d 9, 15; *People v. Matthews* (1990), 205 Ill. App. 3d 371, 413, 562 N.E.2d 1113, 1138.

## IV

In his fourth allegation of error, defendant urges reversal of his conviction because the trial court did not allow him to impeach Jennifer's testimony and because the court prevented him from eliciting Jimmy Abrams' address from the officer who had arrested him while Jimmy possessed the murder weapon. He argues that this evidence was necessary to persuade the jury that Jennifer misidentified the actual criminal, as well as establishing that it was Jimmy and not defendant who killed the victim.

The evidence with which defendant hoped to impeach Jennifer's testimony concerned his brother's whereabouts in 1988. Jennifer had testified that she knew Jimmy Abrams well from having seen him in the neighborhood for two years prior to the incident, thus dating back to January 1988. Defendant sought to prove that this would have been impossible since Jimmy was in the custody of the Illinois Department of Corrections until July 29, 1988. As a result, Jennifer could have seen him hanging around the neighborhood for a year

and a half at most; defendant reasons, therefore, that she must have been perjuring herself on the stand.

■ The court in refusing to allow defendant to present this evidence did not err. Although a witness' testimony may be impeached with evidence which tends to contradict or undermine its believability (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 607.8, at 363-64 (5th ed. 1990)), such contradictory evidence may not be offered if it is merely collateral to the issues in the case. A matter will be deemed collateral if, but for the fact that it contradicts a statement of a witness, it would be inadmissible or, put another way, that its only relevance to the underlying action is that it confutes an element of a witness' testimony. (*People v. Witt* (1992), 227 Ill. App. 3d 936, 592 N.E.2d 402.) Whether a matter is to be considered collateral is addressed to the sound discretion of the trial court, which decision will not be reversed absent a clear abuse thereof resulting in manifest prejudice to the defendant. *People v. Breton* (1992), 237 Ill. App. 3d 355, 603 N.E.2d 1290.

In *City of East Dubuque v. Burhyte* (1898), 173 Ill. 553, 50 N.E. 1077, our supreme court affirmed the trial court's sustaining an objection to the admission of evidence which would refute part of a witness' testimony. The plaintiff alleged that he was injured by a sidewalk constructed of defective lumber. He presented as a witness the builder of the sidewalk, who stated that he used "grub planks" which were hewed out of rafters which were full of knots and holes. The witness stated that he was compelled to use the shoddy material because at the time of the sidewalk's construction there was no lumber yard in the town. The defendant called another resident of the town and asked him whether the town, in fact, had no lumber yard at the time of the sidewalk's construction. The trial court sustained the plaintiff's objection to the question, and the supreme court agreed that the question was improper impeachment. The court concluded that the only matter of substance in the builder's testimony was that he used poor materials. The court noted that where the lumber came from or whether the town had a lumber yard did not detract from his concession that he used defective materials.

As in the case of the lumber yard which had no existence in East Dubuque, the fact that Jimmy Abrams was in prison two years prior to the shooting was irrelevant to the crux of Jennifer's testimony that she knew Jimmy Abrams' appearance and that he was not her brother's shooter. She testified that she knew Jimmy from seeing him around the neighborhood and, while so testifying, she merely estimated that she had seen him there for two years. We have long

recognized that "the law does not require a witness to come to trial prepared to sustain every statement [s]he might make regardless of its materiality to the central issues at trial." (*People v. Watkins* (1974), 23 Ill. App. 3d 1054, 1060, 320 N.E.2d 59, 64.) The fact that she may have known Jimmy for only a year and a half rather than two years would not so impugn Jennifer's testimony in this regard as to give his prison record significance apart from its ability to contradict her statement, a contradiction that does not earn even debater's points for defendant. Jimmy's prison record was indisputably collateral to any of the issues in the case; therefore, the trial court did not err in excluding it.

Defendant also maintains that the court impermissibly limited his presentation of evidence by not letting him elicit Jimmy Abrams' address from the officer who arrested him while Jimmy was in possession of the murder weapon. He claims that this evidence was necessary to show that his brother could have been in the area on the day of the shooting, and thus had the opportunity to commit the murder.

█ We find no error in the court's exclusion. As the State points out, given the wide and easy availability of transportation, Jimmy could have lived anywhere in the Chicagoland area and nevertheless have been present at the scene of the murder on January 3, 1990. The proximity of his residence to the locus of the crime, therefore, was irrelevant. Accordingly, we are constrained to hold that the court did not abuse its discretion in not permitting defendant to inform the jury of Jimmy's address, nor do we deduce any prejudice therefrom. See *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696; *People v. Frazier* (1984), 129 Ill. App. 3d 704, 472 N.E.2d 1183; *People v. Godbout* (1976), 42 Ill. App. 3d 1001, 356 N.E.2d 865.

V

Defendant argues in his fifth assignment of error that the trial court, by sustaining the State's objection to portions of his opening statement, impermissibly limited his defense, and also, by castigating his counsel, led the jury to view the prosecution and the court as being joined together in opposition to defendant. As to the latter argument, its presentation in defendant's brief is incomprehensible and not worthy of further discussion. With regard to the former, it has been recognized that because opening statements serve simply to give the fact finder an overview of the case and to introduce the evidence which the parties will present (*People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900; *People v. Foss* (1990), 201 Ill. App. 3d 91, 559 N.E.2d 254) and, although each is entitled to rather wide latitude

with regard to what amounts to proper comments, counsel is not at liberty to highlight or to refer to facts he has neither the intention nor the ability to produce at trial. (*People v. Cobbins* (1987), 162 Ill. App. 3d 1010, 516 N.E.2d 382.) The trial court is endowed with great discretion when defining the allowable scope of the statement. (*People v. Johnson* (1991), 218 Ill. App. 3d 967, 578 N.E.2d 1274.) A defendant does not establish an abuse of that discretion unless he shows that he was somehow harmed by the court's actions against him. *People v. Thompson* (1991), 234 Ill. App. 3d 770, 601 N.E.2d 765.

■ Defendant fails to persuade that the court abused its discretion here when it sustained the State's objection to portions of his opening comments. The first of his statements which precipitated an objection was his conjecture on what would be the substance of Jennifer's testimony. He speculated that she would deny being forewarned of defendant's presence in the police station prior to making the station house identification of him. While this would appear to be a proper comment on what counsel believed the evidence would show, we, nonetheless, given its tangential relationship to the weight of the evidence to be offered against him, do not find, based on our hindsight assessment of the trial, that the State's objection to the statement or the court's sustaining of it prejudiced him in any discernible manner.

With respect to the other statement struck by the court, counsel informed the jury that he thought another witness would possibly come forth to corroborate defendant's alibi that at the time of the shooting, he was blocks away from the scene, playing basketball. Since, at the beginning of trials, it is difficult if not impossible to predict whether a party is mentioning facts or inferences she will never actually produce at trial, we think it is usually unwise for the circuit court to interfere with a defendant's statements, except, of course, in those rare instances where the inability to present such evidence is clear and unmistakable. Here, although defendant never carried out his objected-to opening comments by producing the unnamed alibi witnesses, we do not believe that the court could have foreseen that failure at the beginning of trial, and, thus, it should have allowed his comments.

We have held, however, that to constitute reversible error, an improper interference with an opening statement must have been a material factor in the defendant's conviction. (*Cobbins*, 162 Ill. App. 3d at 1028, 516 N.E.2d at 395.) Defendant does not even suggest how he was prejudiced by the court's interruption of his comments; he therefore has not borne his burden of establishing the need to reverse his conviction. Moreover, after our review of the record, given the impressive weight of the State's evidence against him, including

two unshakable eyewitnesses and his own apparent knowledge of guilt which the jury could have inferred from his attempt to flee from the police, we can confidently state that the court's sustaining of the State's objection played not even a trivial role in his conviction. Thus, his conviction will not be reversed on that ground.

## VI

Defendant's sixth contention is that the State inhibited his ability to cross-examine Nakita Bailey by withholding from him her address. Thus, he maintains, he was unable to investigate her background or learn of information with which he could discredit her testimony. In making this argument, defendant surely must be unmindful of his participation in the following colloquy which took place on April 15, 1992, prior to defendant's trial.

"[ASSISTANT STATE'S ATTORNEY] BAILEY: I have three additions to our Answer to Discovery. They are family members. It would be Leroy Minn—

MR. COHEN [sic] [(counsel for defendant)]: Are these occurrence witnesses or merely life-and-death witnesses?

THE COURT: I'm not sure that's an issue. Mr. Bailey, make your record.

MR. BAILEY: Leroy Minn, Sabrina Williams, and Nakita Bailey, no relations.

THE COURT: With that, does either side have any other pretrial issues you wish to address?

MR. COHEN [sic]: I ask the State to advise us in writing.

MR. BAILEY: I will allow him to talk to them prior to trial.

MR. COHEN [sic]: I want their address and phone number in writing.
 * * *

MR. BAILEY: I have one reason why I do not want to give a phone and address. If I can call Ms. Williams, I want to put it on the record why I cannot give their addresses and telephone numbers. I will allow counsel to speak with them, but I cannot allow their addresses or telephone numbers to be given out, and I believe Ms. Williams who just testified here [(at the hearing on defendant's motion to suppress her station house identification of him)] and whose name and telephone number has been given out will give the court ample notice as to why these young ladies do not want their addresses or telephone numbers given out.

THE COURT: You don't have to put it on the record. I don't want to know. It has no interest to me. You can discuss that. The question I have is do you have an objection to their not revealing their address and phone number.

MR. COHEN [*sic*]: Pardon me?

THE COURT: *Do you have an objection to being provided with only a summary of their testimony and not an address and phone number?*

MR. COHEN [*sic*]: *I don't initially if he will give me the summary. If I know what the summary of the testimony, I know whether I have to do anything.*" (Emphasis added.)

█ Defendant points to nothing in the record which indicates that he retracted his assent to his being furnished only the summary of Nakita Bailey's testimony and her name as constituting satisfactory compliance with his discovery demand. In addition, during her testimony he never objected or otherwise indicated that she had strayed from the content of the prepared summary, or that the summary gave him inadequate notice of her testimony. It has been held that "[w]here a party *** acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby." (*People v. Jackson* (1991), 145 Ill. 2d 43, 94, 582 N.E.2d 125, 149.) Here, defendant unequivocally relieved the State of the obligation to provide him with the address and phone number of Nakita Bailey. Accordingly, he will not be heard to complain that its failure to tender such information somehow violated his rights.

## VII

In the seventh and final issue alleged as error, defendant argues that the showup procedure at the station house was unduly suggestive and therefore Jennifer's identification of him should have been suppressed by the trial court. To establish the suggestiveness of the showup, he points to the fact that Detective Miller admitted that Jennifer was specifically told beforehand that she would see defendant and that defendant was shown to her while he was seated, allowing the police to obscure the fact that he was not 5 feet 6 inches tall and that he weighed more than 160 pounds. He argues that these factors evince a designed effort on the part of the police to have Jennifer identify him as the shooter even though he did not match the physical description of the person whom she witnessed as having shot her brother.

In *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612, our supreme court, relying upon *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, explained that a determination of whether a particular identification procedure was so suggestive as to become overly conducive to a mistaken identification depended on the totality of the circumstances surrounding the method used. A court passing upon a challenge to the type of procedure used to secure

an identification must conduct a two-part inquiry: first, whether the process was impermissibly suggestive; and second, assuming suggestion, whether testimony with respect to the out-of-court identification is admissible. (See *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.) The *Richardson* court also remarked that it is the defendant's burden to prove that the identification method used resulted in a denial of due process.

If the manner employed for the out-of-court identification is unduly suggestive, the resultant identification is not to be excluded on a *per se* basis, despite the contrary intimations of defendant's reply brief. In *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, the United States Supreme Court expressly disapproved of a *per se* rule of exclusion for out-of-court identifications which were made pursuant to unfairly suggestive procedures. It did so in part because it recognized that

> "[s]ince [a *per se* approach] denies the trier reliable evidence, it may result, on occasion, in the guilty going free. \*\*\* And in those cases in which the admission of identification evidence is error under the *per se* approach but not under the totality approach—cases in which the identification is reliable despite an unnecessarily suggestive identification procedure—reversal is a Draconian sanction." *Manson*, 432 U.S. at 112-13, 53 L. Ed. 2d at 153, 97 S. Ct. at 2252.

Rather than a *per se* rule, the Court, after concluding "that reliability is the linchpin in determining the admissibility of identification testimony" (*Manson*, 432 U.S. at 114, 53 L. Ed. 2d at 154, 97 S. Ct. at 2253), prescribed a totality of the circumstances test to decide whether an out-of-court identification tainted by a suggestive procedure should be admitted at trial.

The *Manson* Court deemed the following factors, which were first mentioned in *Biggers*, meaningful guides to an assessment of the accuracy of a questioned identification: (1) the witness' opportunity to view the suspect at the time of the crime; (2) the witness' attentiveness during its commission; (3) the accuracy of the initial identification; (4) the certainty of the witness in her identification; and (5) the span of time from the crime to the tainted identification. *Manson*, 432 U.S. at 114, 53 L. Ed. 2d at 154, 97 S. Ct. at 2253, citing *Biggers*, 409 U.S. at 199-200, 34 L. Ed. 2d at 411, 93 S. Ct. at 382.

Here, assuming we were to accept defendant's initial premise that the police contrived to have Jennifer identify defendant as the assailant, we do not find, after applying the factors set forth in *Biggers*, that her identification was unreliable or incorrect. She testified to having had a clear view of defendant throughout the incident, and

it would appear from her testimony that she gave detailed attention to the individual who shot her brother, pointing out, for instance, that the shooter wore a "Christmas green" jogging suit, a statement as to which she was corroborated by Nakita Bailey. And, although he took the stand in his own defense, defendant did not bother to deny that he ever wore or even owned such garb. Too, an insignificant amount of time elapsed from the time of the incident until the challenged identification occurred, as witness Jennifer's having confirmed to the police as early as the day after the crime that defendant was her brother's killer.

With respect to the accuracy of her description and the certainty with which she established the identification, the record clearly reflects that from the beginning, her testimony had been that the murderer was "Dusty," whom she knew quite well from the neighborhood. Defendant admits that he is known as Dusty. Despite defendant's repeated efforts, Jennifer never admitted that she had given the physical characteristics which had been included in various police reports and which purportedly described defendant's brother; moreover, she acknowledged knowing defendant's brother, upon whom defendant attempted to deflect culpability for this crime, and she stated without pause that Jimmy Abrams was not the shooter.

Most important, notwithstanding the consistency of her testimony, whether or not she gave the police the initial incorrect physical description of the man who shot her brother was an issue concerning her credibility, which, having been explored extensively by defense counsel during his cross-examination of Jennifer, was before the jury, into whose hands such evaluations are entrusted. As the *Manson* Court noted: "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (*Manson*, 432 U.S. at 116, 53 L. Ed. 2d at 155, 97 S. Ct. at 2254.) Accordingly, since Jennifer's stationhouse identification of defendant meets the criteria of reliability set forth in *Manson* and *Biggers*, we find that the allegedly suggestive procedure used by the police did not so taint that identification as to result in a substantial likelihood of a misidentification; thus, the court did not err in declining to suppress Jennifer's initial out-of-court identification of him.

For all of the reasons discussed above, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN and McCORMICK, JJ., concur.