NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 241605-U

NO. 4-24-1605

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 6, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Boone County |
| TYRONE MADDOX, | ) | No. 19CF204 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | C. Robert Tobin III, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Doherty and Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's summary dismissal of defendant's postconviction petition.

¶ 2   In June 2021, a jury found defendant, Tyrone Maddox, guilty of one count of possession with intent to deliver 100 to 400 grams of cocaine (720 ILCS 570/401(a)(2)(B) (West 2018)) and one count of possession of 100 to 400 grams of cocaine (*id.* § 402(a)(2)(B)), stemming from a traffic stop during which police officers discovered cocaine in the trunk of defendant's car. The trial court later ordered the counts merged and sentenced defendant to 22 years in prison. Defendant appealed his conviction and sentence, and this court affirmed. *People v. Maddox*, 2023 IL App (4th) 220529-U, ¶ 88.

¶ 3   In August 2024, defendant filed his first postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)), which the trial court summarily dismissed at the first stage of postconviction proceedings.

¶ 4            Defendant appeals, arguing the trial court erred by summarily dismissing his postconviction petition because he presented arguable claims that appellate counsel provided ineffective assistance. Specifically, defendant contends appellate counsel should have (1) challenged the denial of his motion to suppress and (2) raised trial counsel's ineffectiveness for failing to (a) introduce a dashcam video of the traffic stop to contradict the officer's testimony that defendant appeared unusually nervous—evidence the State relied upon as circumstantial proof that defendant knew the cocaine was in the trunk—and (b) impeach the officer with inconsistent statements he made during grand jury proceedings regarding the specific traffic violations that justified the initial stop. We disagree and affirm.

¶ 5                                I. BACKGROUND

¶ 6                    A. The Grand Jury Proceedings and the Charges

¶ 7            In August 2019, the State sought a bill of indictment from a Boone County grand jury. Illinois State Police Sergeant Greg Melzer testified to the following at that hearing.

¶ 8            On August 1, 2019, Melzer was stationary in his squad car on Interstate 90, watching westbound traffic. Melzer observed defendant's Chevrolet Malibu bearing a Minnesota registration tag. As defendant drove by, he turned his head almost completely around to look at Melzer. Defendant then immediately made several lane changes and exited the highway, failing to activate his signal at any time. As a result, Melzer conducted a traffic stop and made contact with defendant, who was the sole occupant of the vehicle. Subsequently, a K-9 unit arrived on scene and conducted a free-air sniff of the vehicle, resulting in a positive alert. Melzer searched the Malibu and, in the trunk, under the trunk liner, found five plastic baggies containing a white rock-like substance, which Melzer suspected to be cocaine.

¶ 9            Following the grand jury proceedings, the State charged defendant by indictment

with possession with intent to deliver 100 to 400 grams of cocaine (720 ILCS 570/401(a)(2)(B) (West 2018)) and possession of 100 to 400 grams of cocaine (*id.* § 402(a)(2)(B)).

¶ 10                                    B. The Motion To Suppress

¶ 11        In August 2020, defendant filed a motion to suppress evidence obtained from the traffic stop, arguing that (1) Melzer did not have probable cause to conduct the traffic stop of defendant because he did not commit a traffic violation and (2) the traffic stop was unreasonably prolonged by the dog sniff.

¶ 12        Later that same month, the trial court conducted a hearing on defendant's motion to suppress, at which Melzer and Trooper Alan Taylor testified. The State also introduced into evidence the video from Melzer's dashcam.

¶ 13        Melzer testified that on August 1, 2019, he was sitting on Interstate 90 watching westbound traffic when he saw defendant's vehicle in the leftmost lane, which he referred to as "Lane 1." The following testimony was elicited from Melzer:

> "A. As the vehicle passed me, the driver turned his entire upper body back to his left, looked over his shoulder and looked at me and then immediately made a lane change into Lane 2, *** the center lane.
>
> Q. And when the vehicle passed you, it wasn't going at an excessive speed or anything like that?
>
> A. No. There was nothing overly abnormal about anything the vehicle was doing. There was no other traffic or minimal traffic around the vehicle. I would say it was—to me appeared slightly abnormal that the vehicle was in the left lane on its own considering the left lane is a passing lane, but at that time, it wasn't impeding traffic or anything like that. The only thing that, like I said, slightly abnormal was

- 3 -

that it was just driving by itself in the left lane."

¶ 14 Melzer then radioed Taylor to alert him to be on the lookout for defendant's vehicle while Melzer caught up to it. Taylor radioed back that defendant's vehicle had passed his location; at that point, defendant was in the rightmost lane. Once Melzer was approximately 300 to 400 feet from the vehicle, he saw defendant make a "sudden exit" without activating his turn signal. He followed defendant onto the off-ramp and activated his emergency lights, and the car stopped at the entrance of a gas station.

¶ 15 Melzer approached the driver's side and explained to defendant that he had failed to signal. Defendant provided a Minnesota identification card and insisted his blinker had been on. Defendant then turned on the blinker, and Melzer saw that the right turn signal was functioning after defendant said this. Melzer then directed defendant to move the vehicle out of the way of traffic and instructed him to sit in the squad car while Melzer completed the necessary paperwork for the stop.

¶ 16 Defendant sat in the front passenger seat of the squad car while Melzer conducted database searches. At this point, Melzer learned that defendant's license was revoked in Illinois and suspended in Minnesota. Melzer informed defendant that he would be issued a warning for the signal and a citation for the driver's license violation instead of being arrested and taken to jail. At this point, while processing the stop, Melzer requested that Taylor perform a free-air sniff of the vehicle. Taylor's canine alerted, and the officers searched defendant's car. They discovered bags containing cocaine. Melzer then placed defendant under arrest.

¶ 17 Defense counsel questioned Melzer regarding his grand jury testimony as follows:

"Q. On August 22nd, 2019, is it correct that [the prosecutor] proposed a question to you about what occurred when the driver immediately made a lane

change—whether or not the driver made multiple lane changes and then exited onto the Belvidere Oasis?

A. I don't recall. It's more than a year. You appear to be reading from it so I'm sure that that is the question he asked me, but I don't recall the exact question or that specific interaction.

Q. Would you recall whether or not your response was, 'Yes, he did'?

A. I don't know. I mean, I assume I probably said, 'Yes, he did.' I just don't remember the—I mean, I've done Grand Jury on hundreds of cases so I don't recall specific questions of Grand Jury.

Q. If—do you believe or recall whether or not [the prosecutor] proposed to you that the driver failed to use its signal while making those lane changes and exiting the interstate?

A. Yes.

Q. And do you recall whether or not your response was, 'That's correct'?

A. Yes.

Q. And then do you recall your testimony today that the information that you received from Officer Taylor was that the vehicle was in Lane 3?

A. That's correct.

Q. So would it be correct then that the vehicle did not make several lane changes without signaling prior to exiting at the Belvidere Oasis?

A. It made several lane changes and then failed to signal when exiting the highway."

¶ 18    Melzer clarified that even if no cocaine had been recovered, defendant was not

free to leave until the administrative processing was finished. This processing included (1) issuing a written warning and citation, (2) completing bond paperwork, and (3) running multiple database searches. When the canine alerted, Melzer had finished only the database search and was beginning the paperwork. Finally, because defendant lacked a valid license, he would not have been permitted to drive the vehicle away from the gas station, regardless of the results of the vehicle search.

¶ 19　　　　After the hearing, the trial court issued a written order denying the motion to suppress, noting its evidentiary findings and reasoning. The court summarized Melzer's testimony and the dashcam video, noting that "Melzer's testimony overlapped with much of the evidence observed on the DVD." In its order, the court found Melzer's testimony that defendant changed lanes without signaling to be credible. The court found the video clearly showed that defendant turned the signal on after Melzer advised defendant of the reason for the stop. Further, defendant's conduct—namely, turning the turn signal on when advised of the reason for the stop—corroborated Melzer's testimony that defendant did not use a turn signal before that point. Accordingly, the court found that the stop was valid.

¶ 20　　　　Regarding the dog sniff and duration of the stop, the trial court found that Melzer did not unlawfully prolong the stop because defendant, who was the sole occupant of the vehicle, did not have a valid driver's license and would not have been able to drive the car away from the traffic stop. Further, the court noted that only four minutes passed from the time Melzer found out that defendant did not have a valid driver's license to the time of the dog sniff. It was not feasible for Melzer to write the citation for the driving while revoked offense and the written warning for the turn signal violation in such a short amount of time.

¶ 21　　　　　　　　　　　　　　C. The Jury Trial

¶ 22　　　　In June 2021, the trial court conducted defendant's jury trial, at which the following

- 6 -

testimony was presented.

¶ 23                                    1. *Melzer*

¶ 24        Melzer testified that on August 1, 2019, he was "sitting on Interstate 90 watching westbound traffic" when he saw a gray Chevrolet with Minnesota license plates. As the car passed him, the driver "completely turn[ed] his body and look[ed] over his shoulder back at me" and made an immediate lane change. Melzer followed the vehicle and radioed Taylor, who was about a mile away, advising him to be on the lookout for the car.

¶ 25        Melzer testified he observed the car quickly exit the tollway and pull into a gas station parking lot. The car went "toward the *** gas station gas pumps. It did not get all the way up to the gas pump." Melzer then parked behind the car and approached it on foot. Melzer identified defendant as the driver and sole occupant of the car.

¶ 26        Melzer testified that he asked defendant if he was getting gas and defendant said yes. However, Melzer looked at the car's fuel gauge and noticed it showed the gas tank was more than three-quarters full. Defendant saw Melzer "looking at the gas gauge and then said, oh, no, I'm going to the bathroom." At that point, Melzer asked defendant to move his car away from the gas pumps and off to the side of the parking lot. Once the cars were moved, Melzer asked defendant to come back to his squad car, which defendant did.

¶ 27        Melzer had defendant sit in the front seat of his squad car for officer safety and to expedite the traffic stop. In the car, defendant told Melzer that he was traveling from Indiana to Minnesota after spending three days in Hammond, Indiana. While defendant answered Melzer's questions, Melzer used his computer to obtain information about the vehicle defendant had been driving. Melzer testified that he learned (1) the car defendant was driving was not registered to him, (2) defendant's Minnesota driver's license was revoked, and (3) his Illinois driver's license

was suspended.

¶ 28    While in the car, defendant leaned towards Melzer, "clearly trying to see what [Melzer] was typing or *** looking at on [his] computer." Defendant appeared nervous, and his carotid artery was visibly pulsing in his neck.

¶ 29    Because Melzer believed defendant was possibly involved in criminal activity due to his behavior, Melzer requested that Taylor conduct a dog sniff on defendant's car using the in-car radio. Taylor conducted the dog sniff, which resulted in a positive alert. Melzer asked defendant if there was any reason why the dog alerted to the presence of narcotics in the vehicle. Defendant replied, "Oh, that's because my nephew smoked weed in the car the previous day." (We note that in the squad car video, defendant's response was that his nephew had been smoking in the car that morning.) However, Melzer had not smelled any cannabis at any point during the stop.

¶ 30    Melzer explained to defendant that he was going to search the car and asked "if everything in the vehicle belonged to him." Defendant paused and then said yes. Melzer and Taylor searched the car. Underneath the trunk liner, they found a white plastic shopping bag. Inside the bag were five individual bags, each containing a white, rock-like substance that field tested positive for cocaine and was later confirmed to be cocaine. Melzer placed defendant under arrest. When Melzer told defendant that drugs were found in the car, defendant said only, "nah." According to Melzer, defendant's demeanor indicated he "clearly knew [the drugs] were in the car, was surprised they had been found and was at that point either dejected or defeated." Melzer testified that he collected the evidence he found in the trunk and submitted it to the Illinois State Police Forensic Science Laboratory for processing.

¶ 31    At the police station, Melzer questioned defendant about the cocaine. Defendant denied the cocaine belonged to him. Melzer said to defendant that the cocaine either belonged to

him or the owner of the car—defendant's girlfriend—and defendant agreed. Also, during the interview, defendant called his girlfriend on speaker phone. He told her he had been arrested, but when she started to respond, he told her not to say anything because the police were listening.

¶ 32                                    2. *Deborah McCray*

¶ 33          The parties stipulated that Deborah McCray, an expert in narcotics identification, weighed and tested the substance found by the officers, determining it to be 126.1 grams of cocaine. The parties further stipulated "[defendant] has previously been convicted of the offense of dealing in cocaine. The conviction from May 20th, 1999, for dealing in cocaine arose out of Case No. 45G01-9812-CF-00232 in Lake County, Indiana."

¶ 34                                    3. *Defendant*

¶ 35          Defendant testified that when officers pulled him over, he was headed to his home in Minnesota from Hammond, Indiana, where he had spent two days visiting his father. Defendant testified that while he was in Indiana, his nephew had driven his vehicle for a few hours. When the nephew returned with the car, it smelled like marijuana, causing defendant to leave his nephew behind when he left Indiana. Defendant testified that he had put his items in the back seat while traveling and never looked in the trunk after his nephew had possession of the car. Defendant stated he was shocked when the officers found the cocaine. He stated to the jury that it was not his cocaine and he did not know how it got in the trunk.

¶ 36          Ultimately, the jury found defendant guilty of both counts. The trial court later sentenced defendant to 22 years in prison.

¶ 37                                    D. The Direct Appeal

¶ 38          Defendant appealed the trial court's decision, arguing (1) the court erred by admitting his prior conviction in 1999 for delivery of cocaine, (2) trial counsel was ineffective for

failing to introduce fingerprint evidence, and (3) the State failed to prove him guilty beyond a reasonable doubt. In June 2023, this court affirmed defendant's conviction and sentence. *People v. Maddox*, 2023 IL App (4th) 220529-U, ¶ 88.

¶ 39                                      E. The Postconviction Proceedings

¶ 40           In August 2024, defendant filed a postconviction petition pursuant to the Act. In the petition, he argued, among other things, that appellate counsel was ineffective for failing to (1) challenge the trial court's denial of the motion to suppress and (2) raise trial counsel's ineffectiveness for failing to impeach Melzer at trial with dashcam video and prior inconsistent statements regarding the traffic stop.

¶ 41           In November 2024, the trial court summarily dismissed the postconviction petition at the first stage of proceedings for failure to state the gist of a constitutional claim.

¶ 42           This appeal followed.

¶ 43                                      II. ANALYSIS

¶ 44           Defendant appeals, arguing the trial court erred by summarily dismissing his postconviction petition because he presented arguable claims that appellate counsel provided ineffective assistance. Specifically, defendant contends appellate counsel should have (1) challenged the denial of his motion to suppress and (2) raised trial counsel's ineffectiveness for failing to (a) introduce a dashcam video of the traffic stop to contradict Melzer's testimony that defendant appeared unusually nervous—evidence the State relied upon as circumstantial proof that defendant knew the cocaine was in the trunk—and (b) impeach Melzer with inconsistent statements he made during grand jury proceedings regarding the specific traffic violations that justified the initial stop. We disagree and affirm.

¶ 45                                      A. The Applicable Law and the Standard of Review

¶ 46                                    1. *The Act*

¶ 47        The Act provides a procedure for a criminal defendant to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2024). The Act sets forth a three-stage process for adjudicating postconviction petitions. *People v. Buffer*, 2019 IL 122327, ¶ 45. This appeal concerns a dismissal at the first stage.

¶ 48        At the first stage, the trial court independently reviews the petition and may summarily dismiss it if the petition is frivolous or patently without merit. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). A petition may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis in either fact or law. See *People v. Tate*, 2012 IL 112214, ¶ 9 ("[T]he threshold for survival [is] low."). A petition lacks an arguable basis in fact or law when it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). Fanciful factual allegations are those which are "fantastic or delusional," and an indisputably meritless legal theory is one that is "completely contradicted by the record." *Id.* at 16-17. Our review of a first-stage summary dismissal is *de novo*. *Tate*, 2012 IL 112214, ¶ 10.

¶ 49                              2. *Ineffective Assistance of Counsel*

¶ 50        "To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S.

668, 687 (1984)). "A reasonable probability is a probability which undermines the confidence in the outcome of the trial." *People v. Sturgeon*, 2019 IL App (4th) 170035 ¶ 84. "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697).

¶ 51 However, at the first stage of postconviction proceedings, a petition alleging ineffective assistance may not be dismissed if (1) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (2) it is *arguable* that the defendant was prejudiced. *Tate*, 2012 IL 112214, ¶ 19. A defendant alleging the ineffective assistance of counsel must satisfy both prongs of the *Strickland* test, and his failure to do so precludes a finding of ineffectiveness. *People v. Torres*, 2024 IL 129289, ¶ 27. "Whether a defendant received ineffective assistance of counsel is a question of law that we review *de novo*." *People v. Haynes*, 2024 IL 129795, ¶ 23.

¶ 52 B. The Motion To Suppress Claim

¶ 53 Defendant argues the trial court erred by dismissing his postconviction petition at the first stage because he raised an arguable claim that appellate counsel provided ineffective assistance by failing to challenge the denial of his motion to suppress. Specifically, defendant asserts that, based on (1) inconsistencies between Melzer's suppression hearing and grand jury testimony and (2) Melzer's history of pretextual stops, the court should have rejected Melzer's testimony regarding the circumstances surrounding the basis for the traffic stop and the timing of the dog sniff. Defendant maintains that, in light of these inconsistencies, the court should have concluded the stop was (1) unlawful at its inception and (2) unlawfully prolonged. We disagree.

¶ 54 Defendant has failed to state a plausible claim of ineffective assistance of appellate counsel because nothing in the record or the postconviction petition establishes a

likelihood that the result of the appeal would have been different. We give great deference to trial court credibility findings because the trial court observed the witnesses firsthand. *People v. McIntosh*, 2021 IL App (1st) 171708, ¶ 42. Although findings based on nontestimonial evidence—such as surveillance videos—are not entitled to that same deference (*People v. Harris*, 2015 IL App (1st) 133892, ¶ 19), our review of the video reveals nothing to contradict Melzer's testimony at the suppression hearing.

¶ 55         Defendant essentially argues that Melzer's testimony lacked corroboration. However, the trial court's factual finding that defendant failed to signal could be reversed on appeal only if it was against the manifest weight of the evidence. *People v. Mott*, 389 Ill. App. 3d 539, 542-43 (2009). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the finding is unreasonable, arbitrary, or not based on the evidence. *Id.* at 543.

¶ 56         Regarding the initial stop, both defendant and the trial court noted that the squad car video is inconclusive as to whether defendant used a turn signal when changing lanes. However, Melzer's testimony—though varying slightly from his grand jury testimony—does not differ so significantly as to render the court's credibility findings against the manifest weight of the evidence. Trial counsel impeached Melzer with his grand jury testimony and highlighted those inconsistencies during the suppression hearing. Consequently, the court had the opportunity to fully weigh Melzer's credibility based on the very arguments defendant now raises in his postconviction petition. See *People v. Gray*, 2017 IL 120958, ¶ 47 ("[E]ven contradictory testimony does not necessarily destroy the credibility of a witness, and it is the task of the trier of fact to determine when, if at all, she testified truthfully."). We will not reverse the trial court's ruling based on minor testimonial inconsistencies the court had already weighed and resolved. See

*id.* ¶ 36 ("A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible.").

¶ 57 Second, appellate counsel was not ineffective for failing to challenge the duration of the traffic stop. Although defendant argues the stop was pretextual, he acknowledges that an officer's subjective intentions do not invalidate a stop supported by probable cause. See *Whren v. United States*, 517 U.S. 806, 813 (1996). Nothing in the record indicates that Melzer unreasonably prolonged the stop. Directing defendant to move his car—which was obstructing multiple gas pumps—and enter the squad car was a reasonable measure for safety and convenience. Moreover, these actions likely shortened the encounter because Melzer could work more efficiently within the squad car instead of traveling back and forth between vehicles on the roadside.

¶ 58 The stop occurred within a reasonable time frame. Approximately eight minutes elapsed from Melzer's initial contact to the canine alert, and only five and a half minutes passed while defendant was in the squad car. During this interval, Melzer was diligently pursuing the "mission" of the stop by checking licenses and conducting database searches. See *People v. Thomas*, 2018 IL App (4th) 170440, ¶ 68 ("In a traffic stop, the officer's mission is to check the driver's license, find out if there are any warrants against the driver, inspect the automobile's registration and proof of insurance, and decide whether to issue a ticket."). At the time of the alert, Melzer had completed his database searches but not the paperwork for the warning, citation, and bond. Because the mission of the stop was ongoing, the search occurred within the time reasonably required to complete the traffic stop. See *Rodriguez v. United States*, 575 U.S. 348, 356-57 (2015); *People v. Pulido*, 2017 IL App (3d) 150215, ¶ 41. Furthermore, because defendant lacked a valid license, he could not have driven the car away, and the mission of the stop would have continued until his car was safely moved out of a public space.

- 14 -

¶ 59        Accordingly, because appellate counsel is not required to make a futile argument, defendant suffered no prejudice, and the claim of ineffective assistance fails.

¶ 60                                 C. The Failure To Impeach Claim

¶ 61        Defendant next argues that summary dismissal of his petition should be reversed because he presented an arguable claim that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on direct appeal. Specifically, defendant contends that trial counsel failed to attack Melzer's credibility at trial by impeaching him with (1) dashcam video that defendant asserts would contradict his statements that defendant was unusually nervous during the traffic stop and (2) his previous inconsistent statements (during his grand jury testimony). Defendant also asserts that appellate counsel's failure to raise this issue on direct appeal constituted ineffective assistance. We disagree. Because we conclude that no plausible claim of ineffective assistance of trial counsel exists, there can be no plausible claim of ineffective assistance of appellate counsel.

¶ 62        Defendant points out that his legal theory at trial was that the State failed to prove that he knew the cocaine was in the trunk. He argues that the dashcam video of his interaction with Melzer would have contradicted Melzer's testimony that defendant was extremely nervous during their interaction and the resulting inference that he was nervous because he knew the cocaine was in the trunk. He further asserts that his trial counsel should have impeached Melzer with inconsistencies between his grand jury and suppression hearing testimony. However, like the trial court, we conclude the dashcam video corroborates Melzer's testimony regarding defendant's nervous behavior while in the squad car and would not have been helpful to the defense. Far from being ineffective, trial counsel likely realized that introducing the video would have been damaging to the case and made a strategic decision not to present it. See *People v. Manning*, 241

Ill. 2d 319, 333 (2011) ("[C]ounsel's strategic choices are virtually unchallengeable.").

¶ 63    Further, defendant's petition referred to the impeachment of Melzer with his grand jury testimony and probable cause affidavit only in the context of the suppression hearing. However, those materials did not contain prior inconsistent statements with respect to Melzer's trial testimony. In other words, defendant's petition argues that trial counsel should have asked Melzer at trial about inconsistencies between his grand jury testimony and his testimony at the suppression hearing; he does not claim that Melzer's trial testimony was inconsistent with his earlier testimony given in the case. Defendant could not have impeached Melzer with alleged specific instances of untruthfulness. See *People v. Santos*, 211 Ill. 2d 395, 404 (2004) (noting that specific instances of untruthfulness are not admissible to attack a witness's believability). Because defendant's claim of ineffective assistance at trial relies on a meritless legal theory, it is frivolous and patently without merit.

¶ 64    To the extent defendant argues trial counsel should have elicited testimony regarding the reason for the stop to impeach Melzer with prior inconsistent statements, we conclude such testimony would have been inadmissible. The justification for a traffic stop is collateral to the issues presented at trial. Although the State may introduce evidence of the stop as part of a continuing narrative, the legality of the stop is a question of law for the trial court, not the jury. Introducing further evidence regarding the reasons for the stop would likely confuse the jury on a collateral matter that is an improper basis for determining guilt. See *People v. Marshall*, 2025 IL App (4th) 240368, ¶ 58 (noting that although a witness's testimony may be impeached with evidence that tends to undermine its believability, " 'such contradictory evidence may not be offered if it is merely collateral to the issues in the case' ") (quoting *People v. Abrams*, 260 Ill. App. 3d 566, 579 (1994)). Any attempt to elicit this testimony would have been merely a pretext

to relitigate the motion to suppress, which the trial court had already denied.

¶ 65        The precise number of lane changes defendant made before Melzer pulled him over was irrelevant to the charges against defendant—namely, possession of cocaine. Consequently, the cases defendant cites are unavailing because they address failures to impeach witnesses regarding *material* issues, such as the offender's identity. See *People v. Vera*, 277 Ill. App. 3d 130, 139-41 (1995) (counsel ineffective for failing to impeach regarding the color of a shooter's car); *People v. Salgado*, 263 Ill. App. 3d 238, 246-49 (1994) (counsel ineffective for failing to impeach the only witness to directly implicate the defendant as the shooter); *People v. Garza*, 180 Ill. App. 3d 263, 267-70 (1989) (counsel ineffective for failing to impeach a witness regarding the description of the offender).

¶ 66                       III. CONCLUSION

¶ 67        For the reasons stated, we affirm the trial court's judgment.

¶ 68        Affirmed.