2024 IL App (2d) 230467-U
No. 2-23-0467
Order filed October 28, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-1048 |
| DAVID S. DREHER, | ) ) | Honorable Elizabeth K. Flood, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) Defendant was proved guilty beyond a reasonable doubt of sexually abusing his girlfriend's granddaughter, based on her clear and unequivocal testimony, which the jury reasonably accepted despite her inability to recall the precise date of the abuse. (2) The trial court did not err by barring defendant from mentioning in opening statement a video of the victim playing with defendant on a trampoline, where defendant failed at that time to establish the video's relevance. Further, there was no prejudice, because defendant referenced the trampoline play (if not the video) in opening statement, and the video was ultimately admitted into evidence and referenced by defendant in closing argument. (3) During *voir dire*, the trial court did not err by rejecting defendant's particular phrasing of a question about the jurors' experiences with unwanted sexual contact or by rejecting defendant's suggestion that the court question *in camera* any juror who claimed to have such experience.

¶ 2    Defendant, David S. Dreher, appeals from his conviction, following a jury trial, of predatory criminal sexual assault of a child (PCSAC) (720 ILCS 5/11-1.40(a)(1) (West 2020)). He argues (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred in precluding defense counsel from mentioning a certain video in his opening statement, and (3) the court erred in the way it conducted *voir dire*. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                                A. The Indictment

¶ 5    On August 3, 2022, defendant was indicted on two counts of PCSAC (*id.*). Each count alleged that defendant, "a person seventeen years of age or over, committed an act of contact, however slight, between the sex organ of A.D.[,] a minor under age thirteen years[,] and the hand of the defendant for the purpose of sexual gratification or arousal of the victim or the accused." The victim, A.D., was the granddaughter of defendant's girlfriend (now wife). Count I alleged that the offense occurred "on or about January 1, 2020[,] through May 23, 2022." Count II alleged that the offense occurred "on or about January 1, 2017[,] through December 31, 2019."

¶ 6                            B. Pretrial Motions and Rulings

¶ 7                                1. *Voir Dire*

¶ 8    On September 12, 2023, defendant filed a motion *in limine* regarding jury selection. Defendant asked that a question be posed to the members of the venire about "whether they, or an immediate family member, ha[ve] ever been the subject of unwanted sexual contact." Defendant requested further that, if a juror answered affirmatively, the court question the juror *in camera* to determine whether the juror could nevertheless be fair and impartial.

¶ 9    The trial court heard argument on the motion on September 14, 2023. The State suggested that the court ask the venire "[whether] they know anyone who has been a victim of sexual abuse

or someone who has been accused of sexual abuse and then take it from there if they can be fair and impartial." The court agreed with the State's proposal and further indicated that its "normal procedure" was to tell jurors they could approach the bench if they did not want to answer a question. The court continued:

"I'm not sure how long you stayed last week but we had one person who wanted to approach and answer at a sidebar and then we had 25 people that did that. That's fine. It's a lot more time consuming. So I'm not going to (A) start that way until someone requests it. (B) I'm not going to do it actually *in camera*, if that's what you meant by leaving the room, unless someone actually requests that.

Because that will be I think more time consuming than it was worth because we had a perfectly feasible way of having a private conversation at a sidebar."

¶ 10    Defense counsel responded that his proposed question of whether someone had been the subject of "unwanted sexual contact" was "much more broad" than the question of whether someone had "been [the] victim of sexual abuse." Counsel argued that his proposal was more appropriate because "lay people [do not] think of unwanted sexual contact as being a victim of sexual abuse." He argued that his proposed question "goes to the exact heart of the matter." Counsel also argued that *in camera* questioning was warranted because, recently, he could hear people whispering at the bench when he was at the back of the courtroom.

¶ 11    The trial court denied defendant's request, stating:

"The utmost concern of jury selection is choosing jurors who can be fair and impartial. Not protecting the privacy of jurors, I would state that I have done numerous jury trials without jurors being brought to a back room to answer *voir dire* questions. The fact that we had many, many jurors approach the bench and were able to elicit full

conversations about any prior experience that they had with sexual abuse goes to show that jurors under that procedure are being open and honest. I will not ask jurors questions which will lead to ill-will of information in asking if they have had any unwanted contact would in my mind elicit response about bad dates, among other things, which is not relevant to this case.

The jurors will be read the indictment and will be aware of what the allegations are before these questions are asked. Therefore over what I understand is your objection, I will ask the question, have you or anyone close to you been a victim of or accused of sexual abuse. I will ask that in the array. I will tell everyone they are welcome to request to approach if they wish. If they request to go outside the courtroom, I will deal with that but I am not going to offer that to start."

¶ 12                                     2. The Video

¶ 13    On September 12, 2023, the State moved to bar admission of a video recording, previously disclosed by defendant, which "depict[ed] children playing on an outdoor, raised trampoline above a lawn with a dark fence and trees behind the trampoline." The State argued that the video "contain[ed] voices of multiple people and [was] hearsay evidence." In addition, the State argued that the video was irrelevant.

¶ 14    At the hearing on the State's motion, the State advised the trial court that A.D. accused defendant of sexually abusing her while both were sitting on a couch in A.D.'s home. The State noted that it had learned from defense counsel that a video had been taken by Stephanie Anderson, A.D.'s grandmother, on May 29, 2021, which, according to defense counsel, was the same day as the incident reported by A.D. The video depicted defendant, A.D., and A.D.'s sister playing on a trampoline. The State argued that the video would have to be admitted through a witness and the

conversation in the video redacted, as it would be hearsay. Defense counsel advised that he intended to admit the video through Anderson and asked that it be admitted unredacted. The court inquired as to the video's relevance. Counsel responded that the video was relevant because "[i]t is incredible that [defendant] touched [A.D.] on her vagina under her underpants and then the child went to play with him on the trampoline." The court noted that A.D. did not report that the incident occurred on May 29, 2021, and, further, that Anderson was not in the room when the incident occurred. Counsel conceded that A.D. never reported that the incident happened on May 29, 2021. Counsel also conceded that Anderson was not in the room when the incident occurred. However, counsel claimed that the only day A.D. and defendant were on the couch together was when the video was taken. The court asked how Anderson could know this when "she wasn't there." Counsel answered: "She was six feet behind in another room." The court determined that Anderson would be unable to "tie[ ] up" the date of the video with the incident, because Anderson could not rule out that defendant and A.D. were on the couch together some day other than when the video was taken. The court concluded: "So I would not expect [the video] to be brought up in opening statement. Any relevance would have to be established through the defendant's witnesses." Further, the court found that no hearsay exception applied, and thus, the audio would have to be redacted if the video was later admitted.

¶ 15    Later, before trial, the parties revisited the video issue. The trial court reiterated that the video was irrelevant because A.D. did not provide a date of the incident or say that she was on the trampoline with defendant after the incident occurred. The court noted that it would reconsider the matter during trial if an appropriate foundation were laid. Although the court initially told defense counsel that he "may mention the video at [his] own risk in opening statements because it may not

be admitted at trial," the court ultimately reconsidered this comment and directed defense counsel not to mention the video during opening statements.

¶ 16    Defense counsel then made the following proffer. He stated that Anderson would testify that she and defendant were at A.D.'s house on only two occasions in May: (1) May 23, 2021, for a family party celebrating A.D.'s birthday, and (2) May 29, 2021, the date of the video. He argued that, because A.D. never reported that the incident occurred on her birthday, the only other day it could have happened was May 29, 2021. Thus, according to defendant, Anderson's testimony would establish the alleged offense date.

¶ 17    In response, the State indicated that it had not received a summary of Anderson's proposed testimony and that it was entitled to such if she was going to testify. The State argued further that, in any event, defendant had not laid the necessary foundation for the video and thus should not mention it.

¶ 18    The trial court held that, "even based on the proffer," its prior ruling would stand as to the opening statements.

¶ 19    Defense counsel responded that the trial court's ruling "effectively prevents [defense counsel] from making an opening statement about what [he] believe[s] in good faith the evidence will show at the trial which deprives [defendant] of his ability to effectively mount a defense[.]" The trial court replied:

"And since the defense has chosen to raise this issue on the day of trial and at most two days before trial started on a case that has been—that started more than 12 months ago, this court is unable to make the finding of relevance that would be necessary in order to put information before a jury and to sway them of something that may not be admissible during this trial, and I will not allow you to do that. The relevance has not been shown."

¶ 20                                    C. Jury Trial

¶ 21    The jury trial began on September 18, 2023, and the following evidence was presented.

¶ 22                              1. The State's Evidence

¶ 23    Beth Mullarkey, an investigator at the Kane County Child Advocacy Center (CAC), testified as follows. On May 31, 2022, the CAC was notified by the Department of Children and Family Services (DCFS) that a report of child criminal sexual abuse had been made involving defendant and A.D. Mullarkey, along with DCFS investigator Amanda Glaesmer, interviewed A.D. and other family members.

¶ 24    A.D. testified as follows. She was born on May 23, 2011, and was 12 years old. She lived in a house in St. Charles with her mother, K.D., her father, J.D., and her younger sister, Z.D., who was born on December 12, 2014. A.D. had a grandmother on her mother's side, whom she called "Nana." "Nana" had a boyfriend, whom A.D. considered her grandfather and called "Grampy Scott." A.D. identified defendant as Grampy Scott. ("Nana" was later identified as Anderson.)

¶ 25    A.D. testified that defendant used to come to her home. He stopped coming over after "[h]e touched [her], and it was in a private part." A.D. explained that, by "private part," she meant "vagina." Defendant touched her vagina with "[h]is hand." When asked if it happened more than once, she replied: "I think so, yes." When defendant touched her vagina with his hand, "[i]t made [her] very uncomfortable and weirded out." It made her feel "[u]nhappy," because she "know[s] that's not something people normally do, and they're not supposed to do it." When defendant touched her vagina with his hand, "[h]e rubbed around it." It was "[j]ust the outside." She explained that she was sitting on the floor and defendant "grabbed [her] waist and pulled [her] up onto the couch." She could not remember what she was wearing.

¶ 26  A.D. testified that this incident occurred on a "brown," "L-shape[d]" couch located in the "family room" of her home. A.D. testified that the family had two blue couches before acquiring the brown couch. The blue couches were not in an L-shape like the brown couch; they were "separate." A.D. did not tell anyone when defendant touched her because she was afraid that he would get in trouble. Eventually, she told "Rachel," her therapist at that time.

¶ 27  A.D. was shown photographs, identified as People's exhibit Nos. 1 through 6, which she described as follows. Exhibit No. 1 showed A.D. on her birthday, sitting on a chair in her home; defendant and Anderson were also in the photograph. Exhibit No. 2 also showed A.D. on her birthday, leaning on a chair at the kitchen table; the brown couch, on which defendant touched A.D., was visible in the family room in the background. Exhibit No. 3 showed K.D. and Z.D. on the brown couch. Exhibit No. 4, taken on Christmas, showed A.D.'s uncle's girlfriend and defendant. Exhibit No. 5 showed Z.D. and the family dog sleeping on the brown couch. Exhibit No. 6, also taken on Christmas, showed A.D. and her friends sitting at the kitchen table, with the brown couch visible in the background. The photographs were admitted into evidence.

¶ 28  On cross-examination, A.D. testified that she did not remember telling anyone that defendant had pulled her from the floor to the couch. She testified that her memory was "fairly good." She explained: "I mean, there are some parts that I don't know completely, but I know most of the story." Counsel asked: "The story. Was that your 10th birthday that you just saw pictures of?" A.D. agreed. A.D. also agreed that her tenth birthday would have been May 23, 2021. Counsel asked whether A.D.'s "story" happened before or after her tenth birthday. A.D. replied: "Before— No. Yeah. Probably before." A.D. agreed that she was "having fun" with defendant on her birthday and was not "glaring at him." Counsel asked A.D. whether she gave two different accounts regarding the sound that defendant made when he touched her. She agreed that she had. She

explained that she first thought he was making "a moaning sound" but later remembered it was "more of a humming sound." She said that her later memory was "better." She also testified that she never talked with her mother about what had happened. A.D. did not remember playing on the trampoline with Z.D. and defendant.

¶ 29 K.D., A.D.'s mother, testified as follows. K.D. is married to J.D., with whom she has two children—A.D. and Z.D. Anderson is K.D.'s mother. Anderson began dating defendant in 2003. Defendant was like her "stepdad," and she had a "good" relationship with him. Anderson and defendant would come to K.D.'s house for holidays, "all the major events like birthdays," and "a few other times just, *** for visits, working around the house." K.D. was shown the previously admitted photographs (People's exhibit Nos. 1 through 6) and described what they depicted. She testified that People's exhibit No. 1 showed A.D. sitting at a chair by the window on her birthday. There was an "old blue" couch in the photograph. K.D. testified: "We had just gotten a brown leather couch in our other family room that's off by the kitchen, and we put that couch in this room, the blue old one." K.D. explained that her home has two living rooms. The back of the "very big L-shaped couch *** backs up to the kitchen," creating a "wall of *** couch" between the kitchen area and the living room off the kitchen. When the couch was delivered, it was missing an end recliner.

¶ 30 K.D. testified that she had taken A.D. to see a therapist, whom she identified as "Ms. Rachel," at the "end of April" or in May 2022. "[A.D.] only had maybe one or two sessions before [they] had found out."

¶ 31 On cross-examination, K.D. testified that they still had the brown couch. They also had a trampoline. K.D. had "no idea" if defendant ever played with A.D. and Z.D. on the trampoline. K.D. and J.D. had "[m]aybe two" conversations with A.D. about what A.D. said had happened,

but they took place "[o]nly after [they] met with DCFS." K.D. never relayed any information about the case to A.D.

¶ 32    After K.D.'s testimony, defense counsel asked the trial court whether A.D.'s testimony that she did not recall playing on a trampoline with defendant "change[s] the Court's opinion as to whether or not the admission of that video could have a potential relevant foundation laid[.]" The court responded that, "without further information for the Court to determine that that video is somehow relevant to the date or a date in question, [it] [did] not believe that simply impeaching that witness on her recollection *** is relevant." Counsel asked: "And that still is the Court's ruling despite the fact that the defense has the timeline and the video does show that the video was made at 5:15 p.m. on May 29th of 2021?" The court responded: "Correct at this time."

¶ 33    Rachel Turuc, "an associate licensed marriage and family therapist," testified as follows. In May 2022, she began seeing A.D. "for help with anxiety." During the "sexual abuse portion" of A.D.'s intake assessment, A.D. reported "that her step-grandfather had touched her private parts two times." Turuc, a mandated reporter, then made a report to DCFS. On cross-examination, Turuc testified that she later spoke with K.D. and J.D.

¶ 34    Glaesmer, a child protection specialist for DCFS, testified that she participated with Mullarkey in the investigation concerning A.D.'s allegations. On June 6, 2022, she interviewed A.D. at the CAC. She identified People's exhibit No. 7 as a copy of the video-recorded interview. She identified People's exhibit No. 8 as a transcript of that interview. Glaesmer agreed that both exhibits had been redacted per court order. The video (which was just over 27 minutes) was played for the jury.

¶ 35    The video established the following. After discussing school, extracurricular activities, and the family pets with A.D., Glaesmer asked her if she knew why she was brought to the CAC. A.D.

responded: "Well, I, I kind of know this is about like my grand, not my grandpa. Um, soon to be step grandpa." She identified him as "Scott." She stated that her parents told her that the CAC was "a facility that like helps kids that this happened to them or something."

¶ 36    When Glasemer asked A.D. to tell her what happened, A.D. stated: "Uh, well, he touched my private parts, so." A.D. further stated that she only remembered "specifically all the details from one time" but knew "it happened more than once." She stated: "I forgot when it was. I think it was like in 20, like 20 or something. Um, or maybe 2021." She continued:

> "Um, but, um, my parents said it was 2020, but I, um, I, like, I knew that it happened on the couch that we recently got in 2021, so it had to be in 2021. But, um, he did it on when we were sitting on the couch when they, like, the rest of the family was like sitting in the kitchen or something because like, like we had the family room right here and then the kitchen right there."

A.D. said that the couch was brown. She reiterated that everyone else—K.D., Anderson, and Z.D.—were sitting at the kitchen table; J.D. may have been in the basement. No one else was at her house.

¶ 37    Glaesmer asked A.D. to tell her "everything about [her] and [defendant] being on the couch." A.D. recalled a baseball game being on television. She then stated:

> "[H]e like tickles me a lot and it's really annoying. I don't know how to say stop though, but he like pulls me in and then like he, he like sits me on his lap and then he like reached his hand into my pants and then started touching it."

A.D. recalled wearing a T-shirt and shorts. Glaesmer stated: "Okay. So you said that he put his hand in his pants?" A.D. corrected her: "In my pants." When Glaesmer asked A.D. what happened next, A.D. stated: "Um, well, he kind of just like rubbed his hand around it, and then I think I like

squirmed away and like pulled away and then went into the kitchen, just sat there." A.D. said that she "kind of just like avoid[s] him now." She stated: "[H]e came by at this Christmas and I just didn't go anywhere near him." She further stated: "I gave him glare looks [*sic*] time to time."

¶ 38    A.D. clarified that defendant rubbed his hand "[o]n [her] vagina," that she was wearing underwear, and that defendant's hand "went inside [her] pants, inside [her] underwear." A.D. stated, "[i]t felt weird and gross." His hand was on the skin of her vagina. When asked if defendant's hand went "inside" her vagina, A.D. responded: "No, it was just like on top of it and rubbing it." At Glaesmer's request, A.D. demonstrated how defendant touched her by rubbing her hand back and forth on the arm of the chair on which she was sitting. A.D. said that defendant's other hand was "around [her] stomach, like holding [her] back so [she] couldn't get out." At the time, she was sitting on defendant's lap. Defendant did not say anything to her. No blanket was on the couch, but there may have been laundry. The incident lasted "like two minutes" until A.D. "squirmed out of his *** grasp." A.D. went to the kitchen, sat at the table, and watched her family play a card game. After Anderson and defendant left, A.D. ate dinner with her family.

¶ 39    Glaesmer again asked A.D. when the incident occurred. A.D. said: "[l]ike 2021 or 2020." A.D. said that "[t]he couch" helped her to remember when it occurred. She stated that her family had "two old blue couches." She explained:

"There was like a, it was one that was like, two a two seater, but then there was a three seater one, and then we just got sick of it 'cause it was like falling apart basically. So we went to go get this new brown couch and it had like a recliner in it, but we didn't get that until like maybe in March this year. Um, 'cause like [*sic*] took forever to come or something, but I'm pretty sure we got that couch in 2021 or 2020. But my mom said he

never came in 2021 except for this Christmas. And it didn't happen this Christmas, I just stayed away from him. So it might be 2020, I'm guessing, but then it has happened before." A.D. agreed that the incident on the brown couch occurred "around the time" her family got that couch. A.D. said that "it was like a, a L corner, L couch." She said, "[A]t one end, it had a recliner and then the other end, it had nothing because [they] were waiting for the recliner to come in." She also stated that it was a "leather brown couch." A.D. did not recall "anything else going on that day" other than a "baseball game on."

¶ 40    A.D. recalled defendant touching her the same way before the incident on the brown couch. Initially, she could not recall when those "other times" occurred. Later, she said: "I think *** the last one was probably in 2020, but the one before that was maybe in 2018 or 29 [*sic*]. No, 2018 or 2017." She was "pretty sure" those other instances occurred in her house. She said: "It's touching every time." Later, when asked again, "[H]ow many other times *** this happened," she replied that "it happened once before the 2021 one." Defendant never made her touch him, and he never touched her with any body parts other than his hand. He never took pictures or showed A.D. pictures. When Glaesmer asked A.D. if there was anything else A.D. wanted her to know, A.D. reported that "when [defendant] does it[,] [h]e like, might he like, he says, shush[,] and he like, like he makes a moaning sound."

¶ 41    The only person A.D. told about defendant touching her was her therapist, "Ms. Rachel." A.D. felt comfortable telling her "because [she] [didn't] really know her." A.D. did not like talking about it.

¶ 42    Glaesmer left the room for about three minutes. When she returned, she asked A.D. if she recalled how old she was when the incident occurred. A.D. responded: "Maybe 9. I'm 11 now, so act— maybe 10 actually." She further stated: "[Be]cause I'm not sure if it was 2021 or 2020

because, so it might've been 9 or 10. Okay. I'm guessing 9, but I'm not sure." A.D.'s parents talked to her about what had happened, but they just asked her questions and explained what she could expect going forward. No one told her what to say.

¶ 43 On cross-examination, Glaesmer testified that she was unconcerned that A.D. had been coached on what to say. It was standard practice to ask a subject whether anyone had told them what to say.

¶ 44 Following Glaesmer's testimony, the trial court allowed the State to introduce defendant's certified driving abstract to show his age at the time of the offenses. Thereafter, the State rested.

¶ 45                                  2. Motion for Directed Verdict

¶ 46 Defendant moved for a directed verdict on both counts. The trial court granted the motion as to count II but denied it as to count I. In granting the motion as to count II, the court explained:

> "In the video[,] [A.D.] was asked many questions. She first said it has happened before. Then she did state she thinks it happened in 2017 or 2018 or 2019, and then she said maybe. She said it was touching every time. She did say it was the same as in 2021, and then later said probably the same thing. Later on in the interview, she was asked if she was touched any other times, and she said one time."

The court found insufficient evidence, on count II, as to the "specific element of touching," *i.e.*, evidence that there was "skin-to-skin" contact between defendant's hand and the sex organ of A.D.

¶ 47                                  3. Defendant's Evidence

¶ 48 Anderson testified that she is A.D.'s grandmother. Anderson married defendant in June 2022, and they have been married for 14 months. Anderson and defendant celebrated A.D.'s tenth birthday at A.D.'s home. The party took place the day before A.D.'s birthday. She and defendant

"were only there for a short time." A.D. and defendant were "having lots of fun," and their interactions were "[p]ure joy." A.D. commonly had fun with defendant.

¶ 49    Anderson and defendant returned to A.D.'s house the weekend after A.D.'s birthday, on May 29, 2021, at about 1:30 p.m. There was a Cubs game on the television in the family room. Later that day, at about 5 p.m., Anderson took a video of defendant, A.D., and Z.D. playing on a trampoline. They were having "lots of fun." A.D. was not "glaring at [defendant]," "behaving standoffish" toward defendant, or "avoiding him." They played on the trampoline for about five minutes. When they went inside to talk to the family and say goodbye, A.D. was untying defendant's shoes because "[t]hey didn't want him to leave." They left around 6 p.m.

¶ 50    On cross-examination, Anderson did not recall whether, while videotaping A.D. on the trampoline, she "saw an expression on [A.D.'s] face and *** asked her if she was okay[.]" The State asked if viewing the video would refresh her recollection. Defense counsel asked to approach. The State asked the court to allow it to play the video to refresh Anderson's recollection, and defense counsel did not object. The jury was excused, and Anderson viewed the video to refresh her recollection. When the jury returned, the State asked Anderson whether she had been concerned by the look on A.D.'s face while on the trampoline. Anderson responded no. Anderson testified further that she had been dating defendant since 2003 and that defendant "[v]ery rarely" went with her to her daughter's house—"[o]nce or twice a year." A.D. had a "decent relationship" with defendant and called him "Grampy." Anderson stopped communicating with her daughter and A.D. after this matter was brought to her attention.

¶ 51    Defendant testified that, on May 29, 2021, he played with A.D. and Z.D. on the trampoline. He acknowledged that a video fairly and accurately depicting the scene was taken. Defense counsel moved to admit the video into evidence as substantive evidence. The State did not object. The

video was admitted as Defense exhibit No. 1 and played for the jury. The video is grainy but appears to show the following. Defendant and two girls are playing on a trampoline. One girl, presumably A.D., is wearing shorts. The smaller girl, presumably Z.D., is wearing pink pants. A dog is standing with his front paws on the ladder to the trampoline entrance, which is surrounded by safety netting. Anderson—presumably the voice of the female holding the camera—and defendant briefly speak to the dog. The dog runs off and can be heard barking in the background. Anderson asks: "You okay?" Defendant responds: "Yeh, he's fine." Anderson says: "No. You." Defendant responds: "I'm fine. Why wouldn't I be?" Anderson says: "No. Her." Defendant says, "Oh," and asks A.D., "You okay?" A.D. responds: "Yep." Anderson says: "Okay, just looking at the faces." The girls continue to play and wrestle with defendant.

¶ 52     Defendant testified that the video was taken on May 29, 2021. Defendant was having fun that day; he always had fun with A.D. and Z.D. Defendant was at A.D.'s birthday party six days earlier on May 23. He had fun that day as well. Defendant never touched A.D.'s vagina with his hand. He testified: "Because that's not me. I don't do that kind of stuff. I wouldn't even think of doing something like that because I love her." His interaction with A.D. on May 23, 2021, was good; they played Legos and ran around the house a little bit. A.D. was not avoiding him, glaring at him, or trying to get away from him. They returned to A.D.'s house on May 29, 2021, because A.D. asked them to come back and play. He played with both Z.D. and A.D. He recalled a baseball game on television. He watched the game for about 15 minutes until A.D. asked him to play on the trampoline. A.D. was acting "just fine" on the trampoline. She was not glaring at him or trying to get away. Nothing out of the ordinary happened on the trampoline.

¶ 53     On cross-examination, defendant testified that A.D. and Z.D. would fight for his attention "[o]ff and on." He testified that they both wanted to play with him and wanted all his attention. On

May 29, 2021, A.D. got all his attention because Z.D. left him on the couch with A.D. He testified that "[A.D.] jumped on top of [him] and wanted to play and wrestle around." He agreed that he would tickle A.D., although "she usually started that all the time." There was no special occasion for them to be at A.D.'s house on May 29, 2021. When A.D. initiated tickling with him, he tickled her "[f]eet, knees, legs, body." He did not tickle her anywhere "near her privates ever."

¶ 54    The jury found defendant guilty of PCSAC. Defendant filed a posttrial motion, which the trial court denied. Following a sentencing hearing, the court sentenced defendant to seven years in prison.

¶ 55    This timely appeal followed.

¶ 56                    II. ANALYSIS

¶ 57                    A. Sufficiency of the Evidence

¶ 58    Defendant argues that he was not proved guilty beyond a reasonable doubt of PCSAC. According to defendant, "the number and significance of the inconsistencies within A.D.'s accounts of the alleged conduct in addition to the lack of corroboration of A.D.'s account would not permit a reasonable trier of fact to find *** defendant guilty beyond a reasonable doubt." We disagree.

¶ 59    The relevant question for us is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the responsibility of the trier of fact, the jury here, to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. Brown*, 2013 IL 114196, ¶ 48. We will not substitute our judgment for that of the jury on issues involving the weight of the evidence or the credibility of the witnesses. *Id.* A defendant's conviction will not

be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 60    A defendant is guilty of PCSAC if he

"is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration, and:

(1) the victim is under 13 years of age[.]" 720 ILCS 5/11-1.40(a)(1) (West 2020).

¶ 61    Defendant does not argue that the State failed to prove that the incident *as alleged* by A.D. met the statutory elements. He does not challenge the age element or dispute that the touching A.D. described was a sufficient "act of contact" done "for the purpose of sexual gratification or arousal" of A.D. or defendant. See *id.* Instead, defendant argues only that there is reasonable doubt as to whether the incident occurred. We confine our analysis to that argument.

¶ 62    Viewed in the light most favorable to the State, the evidence established beyond a reasonable doubt that defendant committed the offense and, further, that he did so between the dates alleged—January 1, 2020, through May 23, 2022. A.D. clearly and unequivocally testified that defendant touched her vagina with his hand. She also reported the incident to Turuc and Glaesmer. The jury was able to observe A.D. both at trial and in the video recording of the CAC interview. It is well-established "that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Nevertheless, defendant argues that certain "inconsistencies" in A.D.'s testimony "refuted that any alleged conduct occurred." Defendant relies primarily on A.D.'s testimony that the conduct occurred before her tenth birthday (which was May 23, 2021), that she

- 18 -

was " 'having fun' " with defendant on her birthday, and that she was "guessing" that the incident might have occurred in 2020. Defendant also claims that A.D.'s testimony that she did not recall playing on the trampoline with defendant was "categorically refuted."

¶ 63 To be sure, as noted, A.D. was not able to pinpoint the precise calendar date on which the offense occurred. When she was interviewed at the CAC on June 6, 2022, she stated that she "forgot" when the incident occurred but that it was "maybe 2021." She later stated it was "[l]ike 2021 or 2020." When asked how old she was when the incident occurred, she said: "Maybe 9. I'm 11 now, so act—, maybe 10 actually." At trial, she testified that it happened "[p]robably before" her tenth birthday. We note, however, that in cases involving child sexual abuse, the precise date of the offense "is not an essential factor" and the State is not required to prove it. *People v. Guerrero*, 356 Ill. App. 3d 22, 27 (2005). "The inability to remember exact dates and times merely affects the weight to be given the testimony, and taken alone, does not create reasonable doubt." *People v. Foley*, 206 Ill. App. 3d 709, 715 (1990). Here, A.D.'s inability to recall the exact date of the incident is not so significant as to raise a reasonable doubt of defendant's guilt, nor is the fact that she testified that it "[p]robably" occurred before her tenth birthday.

¶ 64 Significantly, although A.D. could not provide a precise calendar date, A.D. anchored the timing of the incident to the presence of the family's new brown couch. Based on the testimony, the jury could have reasonably concluded that the incident occurred on May 29, 2021. There is no dispute that defendant and Anderson were present at A.D.'s home on at least two occasions in May 2021: (1) May 23, 2021, for A.D.'s tenth birthday party, and (2) May 29, 2021. K.D. testified that, at that time, the family "had just gotten a brown leather couch," which was in the family room off the kitchen. At the CAC interview, A.D. reported that the incident happened on the brown couch. She also stated that the couch helped her to remember when the incident occurred, because the

incident happened "around the time" her family acquired a new brown couch. At trial, A.D. testified consistently that the incident occurred on the brown couch. She testified that defendant pulled her up from the floor onto the brown couch and that he touched her vagina with his hand. A.D. also reported to Turuc that, when the incident occurred, there was a baseball game on the television, that she did not recall anything else going on that day, and that Anderson, K.D., and Z.D. were sitting at the kitchen table. Anderson and defendant both agreed that a baseball game was on the television when they were present on May 29, 2021.

¶ 65    Although A.D. did not mention at the CAC interview that defendant pulled her from the floor onto the couch, she did not deny that he did so. Indeed, her statements at the interview were not inconsistent with her testimony. She stated that defendant "tickles [her] a lot." She explained that, when he does so, defendant "*like pulls [her] in and then *** sits [her] on [his] lap* and then he like reached his hand into [her] pants and then started touching it." (Emphasis added.) Moreover, defendant agreed that he would tickle A.D. but maintained that, on May 29, 2021, she "jumped on top of [him]" and that he did not tickle her anywhere "near her privates ever." Thus, defendant confirmed, at the very least, that he tickled A.D. on the couch that day.

¶ 66    Defendant also points to A.D.'s inability to recall playing on the trampoline with defendant. He asserts that that "fact was categorically refuted by ample evidence," thus insinuating that her testimony on this point impacts her credibility. We note, however, that A.D. did not deny that she ever played on the trampoline with defendant; she simply could not recall doing so. The video of the event did not "categorically refute[ ]" her professed inability to recall the event. In any event, the jury heard A.D.'s testimony on this point and did not find that it discredited her testimony as to the alleged offense.

¶ 67    Based on the foregoing, we cannot say that the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of defendant's guilt.

¶ 68                              B. Opening Statements

¶ 69    Defendant contends the trial court erred by precluding defense counsel from mentioning the trampoline video in his opening statement. Defendant argues that the court's ruling prevented him from presenting his theory of the case.

¶ 70    "A trial court has 'great discretion' when defining the allowable scope of opening statements." *People v. Lee*, 342 Ill. App. 3d 37, 50 (2003) (quoting *People v. Abrams*, 260 Ill. App. 3d 566, 581 (1994)). " 'A defendant does not establish an abuse of that discretion unless he shows that he was somehow harmed by the court's actions against him.' " *Id.* (quoting *Abrams*, 260 Ill. App. 3d at 581). "To constitute reversible error, an improper interference with an opening statement must have been a material factor in the defendant's conviction." *Id.*

¶ 71    Defense counsel argued to the trial court that the trampoline video was relevant because A.D.'s willingness to play with defendant would undermine her testimony that defendant sexually abused her earlier that day. The court's decision to preclude defendant from mentioning the trampoline video in his opening statement was premised on its conclusion that defense counsel had not established the relevancy of the video. If the precise date of the incident could not be established by A.D.'s testimony, there was no reason to think that the video was relevant to the incident. Indeed, at the hearing, defense counsel conceded that A.D. would not testify regarding the specific date that the incident occurred and, further, that Anderson (who recorded the video) was not present on the couch when the incident happened. Thus, according to the court, absent additional testimony, the relevancy of the video had not yet been established. Defendant makes no argument on appeal that the court abused its discretion in this regard. Accordingly, he has forfeited

any argument that the court's ruling as to the relevancy of the video (which formed the basis of its decision to bar mention of the video in opening statements) was an abuse of discretion. See Ill. S. Ct. R. 341(h)(7) (Oct. 1, 2020) (points not argued in the opening brief are forfeited and may not be raised for the first time in the reply brief); *People v. McDaniel*, 2021 IL App (2d) 190496, ¶ 60. Thus, we cannot conclude that the court improperly interfered with defense counsel's opening statement.

¶ 72    Nevertheless, even if we were to conclude that the trial court improperly interfered with defendant's opening statement by precluding defense counsel from mentioning the video, defendant has not shown this to be reversible error. Defendant argues that the court's ruling on the relevancy of the video "deprived *** defendant of his ability to employ his chosen trial strategy by preventing his defense counsel from stating facts in his opening statement that he was substantially certain (and was correct) would describe evidence to be admitted at trial." He goes on to state that he cannot disclose his trial strategy on appeal because it would provide the State with "an unconstitutionally unfair advantage upon a retrial." However, to establish reversible error, defendant must show that the error was "a material factor" in his conviction. He makes no sufficient argument in that regard.

¶ 73    In any event, on this record, any arguable error was not a reversible one. Defense counsel argued below that the video was relevant because "[i]t is incredible that [defendant] touched [A.D.] on her vagina under her underpants and then the child went to play with him on the trampoline." Defense counsel remarked as follows in his opening statement:

"MR. CAVER [(DEFENSE COUNSEL)]: Nobody is going to tell you that a child is going to remember every detail. A child is going to remember important things, and you are going to hear this child's story changes. You're not going to hear many details.

You're going to hear that there was a baseball game on TV. And [A.D.] is going to tell you that she was watching baseball when [defendant] touched her, and then you're going to hear testimony that moments after that, she and her sister were outside jumping on a trampoline with [defendant] tying his shoes together because they didn't want him to leave.

Nobody is deprecating the seriousness of child sexual abuse when it occurs. Here it is important that you listen to all of the facts. You decide for yourself whether the only person you are going to hear testify about the incident, what actually happened to her, is telling the truth or whether she is lying.

Check your common sense when deliberating on the verdict. It doesn't make sense that immediately following this incident they were jumping on a trampoline laughing—

MS. SCHMIDT [(ASSISTANT STATE'S ATTORNEY)]: Objection, [Y]our Honor.

THE COURT: Sustained.

MR. CAVER: I ask that you look at the evidence, that you carefully consider each and every aspect of the evidence, that you judge for yourself whether this person is telling the truth and whether that truth makes any sense or whether this person is simply lying.

Thank you all."

¶ 74    As noted, the video's existence was first brought to the jury's attention during the presentation of defendant's evidence. Anderson testified about being present on May 29, 2021, and taking the video. When she denied seeing "an expression on [A.D.'s] face and *** ask[ing] her if she was okay," the trial court allowed the State to refresh her recollection by viewing the

video outside of the jury's presence. Defense counsel then introduced the video as substantive evidence through defendant's testimony.

¶ 75    In closing arguments, defense counsel argued that A.D. was incredible. Counsel noted that "[A.D.] testified that she could never play on the trampoline with [defendant].[1] You saw the video of her playing on the trampoline with [defendant]. You saw that video playing and you heard those girls laughing." Counsel also noted that A.D. testified that the incident happened before her tenth birthday, that defendant was present at A.D.'s tenth birthday party, and that A.D. invited defendant back the next week because she wanted to play with defendant. Counsel again referenced "bouncing around and laughing on a trampoline with [defendant]." Counsel also noted A.D.'s statement at the CAC interview that, after the incident happened, she avoided defendant. Counsel argued: "She certainly was not avoiding him on the trampoline on May 29th." Counsel later stated:

> "[A.D.] was telling you what she wanted you to hear. She was playing along. She has never avoided [defendant]. She didn't avoid [defendant] after she says in her story that this happened because this never happened. A kid does not bounce around on a trampoline laughing with her step-grandfather after he has done the horrific thing that she accuses him of."

¶ 76    Based on the foregoing, the record makes clear that defendant was not deprived of the opportunity to present his theory of the case, *i.e.*, that A.D. was incredible. Accordingly, the court's

---

[1]A.D. did not testify that she "could never" play on the trampoline with defendant. Defense counsel may have been referencing A.D.'s testimony that she did not recall playing on the trampoline with defendant and Z.D.

failure to allow him to mention the video in opening statements was not a material factor in his conviction.

¶ 77                                    C. *Voir Dire*

¶ 78    Last, defendant contends that "the trial court made an insufficient inquiry to individual jurors in order to determine whether those jurors had been affected negatively by sexual abuse in their or their loved ones' lives." More specifically, he argues that the court erred in declining to ask his proposed question and to question the jurors "in the specific manner requested."

¶ 79    *Voir dire* is designed to effectuate a criminal defendant's constitutional right to an impartial jury. *People v. Encalado*, 2018 IL 122059, ¶ 24. As such, " '[t]he purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath.' " *Id.* (quoting *People v. Cloutier*, 156 Ill. 2d. 483, 495-96 (1993)). The manner, extent, and scope of *voir dire* rest within the sound discretion of the trial court. *Id.* ¶ 25. " 'An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice.' " *Id.* (quoting *People v. Rinehart*, 2012 IL 111719, ¶ 16). "Stated differently, a trial court 'does not abuse its discretion during *voir dire* if the questions create "a reasonable assurance that any prejudice or bias would be discovered." ' " *People v. Prince*, 2024 IL App (2d) 230027, ¶ 38 (quoting *Rinehart*, 2012 IL 111719, ¶ 16 (quoting *People v. Dow*, 240 Ill. App. 3d 392, 397 (1992)).

¶ 80    A particular question is not " 'constitutionally compelled' " merely because it would be " 'helpful.' " *Encalado*, 2018 IL 122059, ¶ 25 (quoting *People v. Terrell*, 185 Ill. 2d 467, 485 (1998)). "[R]ather, the trial court's failure to ask the question must render the defendant's

proceedings fundamentally unfair." *Id.* (quoting *Terrell*, 185 Ill. 2d at 485). Further, "[a]lthough a trial court may in the exercise of its discretion allow sequestered *voir dire* [citations], only when the court's actions have frustrated the purpose of *voir dire* will an abuse of discretion be found [citations]." *Cloutier*, 156 Ill. 2d at 496.

¶ 81    Here, at the outset of the jury selection process, the trial court advised the venire on the nature of the case. The court read the indictment, which specifically described the offenses. Thus, the jury was aware that each offense involved "an act of contact, however slight, between the sex organ of AD[,] a minor[ ] under 13 years, and the hand of the defendant for the purpose of sexual gratification or arousal of the victim or the accused." The court also explained the jury selection process. In so doing, the court advised the potential jurors that they would be asked questions by both the court and the attorneys. The court expressly stated: "If the answers to any of their questions or my questions will be embarrassing to you, please indicate this, *and we can talk privately at the bench or in my chambers*." (Emphasis added.) The court also admonished the jurors to "please be frank, honest, and complete" when answering the questions and reminded them that they "will be under an oath to do so, and [that] this is the only way that we can ensure the fairness of the proceedings."

¶ 82    After providing additional admonishments and swearing in the potential jurors, the trial court began asking questions. As is relevant here, the court posed a general question regarding whether "[they] or someone close to [them] has been charged with a crime." Two individuals responded affirmatively, and the court conducted further inquiry. The court next asked the potential jurors whether "[they] or anyone close to [them] [has] been a victim of a crime." Five jurors responded affirmatively and the court conducted further inquiry. The court then stated: "Because of the nature of this case, I am going to ask if it wasn't encapsulated in the last question.

Some of you may have answered this already. Have you or anyone close to you been the victim of or accused of sexual abuse?" No juror raised a hand. After a brief exchange with a juror about a medical condition, the court then asked:

"Is there anything else about the nature of this offense that would affect your ability to be fair and impartial? So if there is anyone—Anyone who has heard based on the questions or the answers, is there anything else about the nature of the offense that would affect your ability to be fair and impartial?"

Two individuals replied—one stated that she taught five-year-olds and that the "nature of th[e] case does affect [her]," while the other expressed religious concerns over judging another person.

¶ 83    Given the above, we find no abuse of discretion in the trial court's refusal to ask specifically "whether they, or an immediate family member, ha[ve] ever been the subject of unwanted sexual contact." As the court reasoned, "asking [jurors] if they have had unwanted contact would *** elicit responses about bad dates, among other things, which is not relevant to this case." The court's reasoning makes clear that it believed the proposed question was overbroad and would invite irrelevant responses. Moreover, the questions posed by the court, taken together, were sufficient to create a reasonable assurance that any bias or prejudice harbored by jurors resulting from their own experiences would be discovered. The jurors were advised of the nature of the case, asked specifically about their personal experiences with sexual abuse, and asked further if there was anything about the nature of the case that would preclude them from being fair and impartial.

¶ 84    We turn to defendant's claim that the court failed to question jurors "in the specific manner requested." First, we note that, in his brief, defendant does not specify the "specific manner" under which he claims the court should have conducted its examination. In his posttrial motion, he maintained that he suggested a "procedure" to the court that "involved determining which

members of the venire felt comfortable discussing such matters outside the presence of other members of the venire and non-essential court staff, with only the judge, court reporter, and counsel present." However, on appeal, defendant does not expressly argue that the court abused its discretion in failing to conduct *in camera* questioning. Nor does he advance any argument, supported by relevant authority, on the issue. Rather, he simply alludes (without record citation) to an argument he made below: "[a]s set forth in the defendant's post-trial motion, under proper and reasonably efficient conditions to ensure their candor, members of the venire are willing to be up front about their and their family members' own personal historical unwanted sexual experiences." Standing alone, this remark does not amount to argument; it is simply a statement that, in the appropriate setting, jurors will be candid about their unwanted sexual experiences. See *Graham v. Lakeview Pantry*, 2019 IL App (1st) 182003, ¶ 26 (the appellate court "is not a repository for an appellant to foist the burden of argument and research" and that an appellant who fails to develop an argument or support it with appropriate authority thus forfeits review of that argument); Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (an appellant's briefs must contain "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. *** Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). To the extent that defendant means to incorporate an argument he made below, we reject the attempt. See *People v. Guest*, 166 Ill. 2d 381, 413-14 (1995) (a party cannot develop an argument on appeal simply by incorporating arguments made below) Accordingly, defendant has forfeited any issue regarding the way the court conducted *voir dire*.

¶ 85    Forfeiture aside, we find no error. In rejecting defendant's argument below that *in camera* questioning was warranted, the trial court explained that it had conducted "numerous jury trials

without jurors being brought to a back room to answer *voir dire* questions." The court specifically noted that it had "many, many jurors approach the bench" and engage in "full conversations about any prior experience that they had with sexual abuse." Thus, the court concluded that "jurors under that procedure are \*\*\* open and honest." The court's decision was reasonable. In any event, we note that the court *did* expressly provide the potential jurors with the opportunity to speak privately with the court, stating: "If the answers to any of their questions or my questions will be embarrassing to you, please indicate this, *and we can talk privately at the bench or in my chambers*." (Emphasis added.)

¶ 86                              III. CONCLUSION

¶ 87    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 88    Affirmed.